1
2
3
4
5

Richard D. Greenfield
Marguerite R. Goodman
Ann M. Caldwell
Ilene F. Brookler )CA Bar #269422)
Greenfield & Goodman, LLC
250 Hudson Street-8th Floor
New York, NY 10013
(917) 495-4446
whitehatrdg@earthlink.net

6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

_____

8

R. A. FEUER, derivatively on behalf
of WELLS FARGO & COMPANY,

:
:
:

CIVIL ACTION

Case No 3-18-cv-02866 (JST)

9

Plaintiff,

:
:
:

AMENDED COMPLAINT

10

v.

:
:

11
12
13
14
15
16
17
18
19

JOHN D. BAKER, II; JOHN S. CHEN;
DONALD M. JAMES; JAMES H. QUIGLEY;
FEDERICO F. PEÑA; SUZANNE M.
VAUTRINOT; ENRIQUE HERNANDEZ, JR.;
CELESTE A. CLARK; THEODORE F. CRAVER;
MARIA R. MORRIS; KAREN B. PEETZ;
JUAN A. PUJADAS; RONALD L. SARGENT;
STEPHEN W. SANGER; CYNTHIA MILLIGAN;
JOHN G. STUMPF; TIMOTHY J. SLOAN;
SUSAN G. SWENSON; CARRIE L. TOLSTEDT;
JOHN R. SHREWSBERRY; MICHAEL J.
LOUGHLIN; ELAINE L. CHAO; SUSAN E.
ENGEL; JUDITH M. RUNSTAD, FRANKLIN
CODEL, DAWN MARTIN HARP, AVID
MODJTABAI, NATIONAL GENERAL
HOLDINGS CORP.; NATIONAL GENERAL
INSURANCE COMPANY,

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

20

Defendants,

:
:

- and -

21

:

22

WELLS FARGO & COMPANY,

:

Nominal Defendant.

:

23

_____

24

**AMENDED COMPLAINT**

25
26
27

Plaintiff R.A. Feuer, for his Amended Complaint against the defendants named herein,

alleges as follows:

28

1

## I.     NATURE OF ACTION AND SUMMARY OF CLAIMS

1.      Plaintiff brings this shareholder derivative lawsuit, on behalf and for the benefit of nominal defendant, Wells Fargo & Company ("Wells Fargo" or "the Company"), against the defendants named in this Complaint, who are present and former members of the Company's Board of Directors (the "Board"), and/or present and former members of senior management of the Company and/or its wholly-owned subsidiary, Wells Fargo Bank, N.A. (the "Bank") (collectively, the "Individual Defendants"), and against defendants National General Holdings Corp. and National General Insurance Company, who provided and administered the forced placed automobile collateral protection insurance that is at issue with respect to certain of plaintiff's claims in this action.

2.      In recent years, Wells Fargo, one of the world's largest financial institutions, has operated as a rudderless ship, devoid of meaningful leadership and oversight by its Board and its most senior corporate management.   There has been a quest for unbridled, undisciplined and unprincipled growth, for the sake of growth and financial gain for the very fiduciaries entrusted to safeguard the short and long term interests of the Company and its shareholders. This quest has become the guiding and motivating principles of the Individual Defendants. It has been facilitated by strategically fitted blinders placed over the eyes of the Company's Board members and senior managers.

3.      As a result of the many serial breaches and defaults by its Board and senior management, Wells Fargo has been beset by one scandal after another.   Regulatory, civil and criminal investigations and sanctions have resulted in massive financial loss and public ridicule.

4.      The scandalous conduct at Wells Fargo has been manifested in many forms, including, inter alia, the illegal practice of secretly opening millions of unauthorized deposit and credit card accounts in the names of unsuspecting customers, as well as the unauthorized and forced placement of often times unneeded collateral protection insurance ("CPI") on hundreds of

2

thousands of the Bank's automobile financing customers; and other large scale improprieties referred to in this Complaint.

5.      On behalf of plaintiff, his counsel sent two separate pre-suit written demand letters to the Board pursuant to Fed.R.Civ.P. 23.1: an initial demand dated December 12, 2016 ("Initial Demand" or "Initial Demand Letter") (Ex. A hereto), and a supplemental demand dated October 30, 2017 ("Supplemental Demand" or "Supplemental Demand Letter") (Ex.B hereto).

6.      In response to each such Demand, the Board appointed from among its members a committee of purportedly "independent" directors (variously referred to as the "Oversight Committee," the "Demand Review Committee" and/or the Committee of "Independent Directors" of the Board), who were charged, purportedly, with investigating plaintiff's pre-suit demands and recommending a response by the full Board.

7.      In each case, the purportedly "independent" directors, designated by the Board to investigate matters in which their own suspect conduct and potential liability to the Company would hang in the balance, orchestrated investigations that were controlled and supervised by the very law firm that was representing these and other non-employee (or "outside") directors in other related shareholder lawsuits.  As such, the Board did not act reasonably and in good faith because Shearman & Sterling, LLP ("S&S") was seriously conflicted and not capable of objectively and fairly addressing plaintiff's demands or conducting the investigations independently on behalf of their various director clients. Indeed, such investigations were a sham and, in light of the fact that they were carried out for the benefit of the Individual Defendants and not at all for Wells Fargo, the processes undertaken amounted to a waste of Wells Fargo's assets.

8.      Predictably, the Board's members, upon direction of their heavily conflicted legal counsel, rejected plaintiff's Demands for, *inter alia*, independent investigations of the subject matter of the Demands and for the institution of legal action to recover damages from responsible parties.  See Ex. C and D.  They also rejected plaintiffs' demand that, because of the

bloated and unmanageable structure of Wells Fargo, the Board undertake a spin-off or otherwise effectuate a structural re-orientation of the Company's business lines and/or bring about other simplifications to structures of both Wells Fargo and the Bank.  See Ex. C.  Furthermore, the investigations failed to recommend or seek even the slightest redress relating to the abject culpability of the members of the Board.

9.      The oversight failures by the Company's directors and officers have been so massive that they have resulted in, *inter alia*, well over $1 billion in financial damages to it, and sharp criticism from the Federal Reserve Board (the "Federal Reserve") and other regulatory bodies of the Company's risk oversight history and mechanisms.  The Federal Reserve also has taken the extraordinary step of restricting the Company's growth until it is able to demonstrate that it has corrected its internal governance and controls and can show they are adequate.  The Federal Reserve further directed the replacement of several directors.  *See* Order to Cease and Desist Issued Upon Consent, Board of Governors of the Federal Reserve System, February 6, 2018.

10.      Within weeks after the Federal Reserve's extraordinary sanction of the Company and its Board members in February, 2018, and despite all of the negative publicity in the face of continuing scandals, and regulatory and civil sanctions, the Board approved a substantial, multi-million dollar raise for the Company's Chief Executive Officer, defendant Timothy Sloan, representing the second largest raise among major bank CEOs for the year, despite dismal relative performance metrics at Wells Fargo and his personal culpability.

11.      In response, one Wall Street commentator aptly observed that:

"Sloan, in a recent interview with Bloomberg News…tried to paint Wells Fargo's troubles as in the past -- mistakes made years ago that the media is just reporting now and making them sound new. But the Fed's sanctions are not ancient history.  It cited Wells Fargo for having poor internal controls, an issue that regulators said continued to be the case as recently as last month. In addition, it would be one thing to say that Sloan came

into a tough situation and had a lot to clean up. But he's been at the bank for years, while the problems were developing, and he's the one who told the Los Angeles Times in 2013, after having been presented with evidence that the bank was creating fake accounts, that Wells Fargo didn't have a problem. Sloan faced a high bar to prove he was turning away from the bank's bad past, and he hasn't met that.

Much of the root of the problems that have plagued Wells Fargo had to do with bad incentives and a lack of accountability. The bank's sales representatives were compensated based on the number of accounts for each customer, not on whether customers actually needed those accounts or whether they produced profits. Carrie Tolstedt, the executive most closely tied to the fake account scandal, was initially allowed to leave with a nine-figure payout and a big pat on the back. When JPMorgan Chase & Co. ran into its London Whale troubles, the bank cut CEO Jamie Dimon's pay by 50 percent. Vikram Pandit, Citigroup's former CEO, was paid only $1 for a time. That's what real accountability looks like.

Some have called for Wells Fargo to remove Sloan; instead, the bank's board rewarded him with a 36 percent pay raise for a job not yet well done. Wells Fargo, for whatever progress it has made, still has plenty left to fix.

See  https://www.bloomberg.com/gadfly/articles/2018-03-15/sloan-pay-raise-shows-wells-fargo-still-lacks-accountability.

12.   California's State Treasurer, who controls billions of dollars of investment capital and the investments of entities that are substantial Wells Fargo shareholders, aptly described the Bank as being in a "death spiral."  He is reported to have stated:

"The once-storied financial institution is not only mired in a death spiral of scandalous revelations, costly litigation and brand toxicity, but has just been rocked by federal regulators with penalties so severe that Wells Fargo may now occupy a special place in

5

the annals of American banking history," Chiang told the Business Times in a statement. "To respond by awarding a $4.6 million performance bonus to its feckless CEO is the very definition of tone deaf, unrepentant and shameless," Chiang said. "Those moneys would be better spent on improving the bank's weak governance and risk management processes or on creating a reparations fund dedicated to improving the financial fluency of the poor, minority and immigrant communities targeted and fleeced by Wells Fargo."

https://www.bizjournals.com/sanfrancisco/news/2018/03/16/california-treasurer-takes-aim-at-wells-fargo-ceo.html.

13.     The allegations in this Complaint are based upon personal knowledge of the plaintiff as to himself, and upon information and belief as to all other matters.  Plaintiff's information and belief are based upon, *inter alia*, the investigation of his counsel and includes, among other things: the information contained in Wells Fargo's filings with the United States Securities and Exchange Commission ("SEC") and press releases and other statements publicly disseminated to the investment community; news articles and other commentary appearing in the popular and financial trade press concerning the subject matter of this action, and the governmental investigations, law enforcement actions, congressional hearings, and other proceedings relating thereto; pleadings, briefs and other materials filed in connection with the many ongoing legal proceedings relating to the subject matter of this action, including the lawsuit styled *In re Wells Fargo & Company Shareholder Derivative Litigation*, Lead Case No. 3:16-cv-05541-JST (N.D. Cal.), *Shaev v. Baker*, Case No. 16-CV-5541-JST (N.D. Cal.) collectively, the "Consolidated Action"), *Armando Herrera, et al. v. Wells Fargo Bank, N.A.*, Case No. 18-CV-00332 (C.D. Cal.); *Hefler v. Wells Fargo & Co.*, 3:16-cv-05479 (N.D. Cal.), *Hancock, et al. v. Wells Fargo & Company*, Case No., 17-cv-04324-JD, and  *In re Wells Fargo Collateral Protection Insurance Litigation*, 8:17-ML-2797 (C.D. Cal.),   judicial opinions issued in connection therewith, and communications between counsel for the Board (and its so-called "Demand Review Committee"

6

and "Oversight Committee") and counsel for plaintiff.  On August 18, 2017, plaintiff made a written demand on Wells Fargo pursuant to 8 Del. C. §220 seeking documents going to the heart of his claims as set forth in the Initial Demand Letter and otherwise.  The Company would not produce any of the requested documents despite its clear obligations otherwise.

14.     Plaintiff believes that many of the relevant facts concerning the matters referred to in this Complaint have not yet been disclosed publicly.  In addition, governmental entities and regulatory bodies are believed to be continuing to investigate facts and circumstances relating thereto.  Plaintiff believes that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.  JURISDICTION AND VENUE

15.     The claims asserted in this Complaint arise under and pursuant to applicable Delaware law, Wells Fargo's state of incorporation, and applicable common law. No claims are alleged herein pursuant to federal law.

16.     This Court has jurisdiction over the subject matter of this action, under and pursuant to 28 U.S.C. § 1332(a)(2), based upon the diversity of citizenship of plaintiff, a citizen and resident of the State of Indiana, on the one hand, and the defendants, on the other hand, all of whom are believed to be citizens of states other than Indiana, and because the amount in dispute exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper in this District because (a) Wells Fargo is headquartered in and maintains its principal place of business in this District, and (b) substantial acts in furtherance of the wrongdoing alleged and its effects occurred in this District.

## III.  PARTIES

**Plaintiff**

18.     Plaintiff R.A. Feuer, a citizen and resident of the State of Indiana, is currently a Wells Fargo shareholder and has been a shareholder continuously throughout the period of time

Amended Complaint

relevant to this lawsuit through the present (i.e., more than 10 years).

**Defendants**

**A.    Individual Defendants**

19.     The following individuals named as defendants are presently or formerly members of the Board and the specified committees thereof, and/or present and former members of the senior management of the Company or the Bank, who committed and participated in the breaches of duties complained of herein. Each such Individual Defendant is named as such solely for their conduct during the period that they served as officers and/or directors of the Company and/or the Bank.

20.     Defendant John D. Baker II is believed to be a citizen and resident of the State of Florida. Since 2009, defendant Baker has served as a member of the Board, and has served on its Audit and Examination Committee, the Credit Committee, and the Corporate Responsibility Committee.

21.     Defendant John S. Chen is believed to be a citizen and resident of the State of California. From 2006 to 2018, defendant Chen served as a member of the Board, on its Human Resources Committee.

22.     Defendant Lloyd H. Dean is believed to be a citizen and resident of the State of California.  From 2005 to 2018, defendant Dean served as a member of the Board, and was Chairman of its Human Resources Committee, the Corporate Responsibility Committee, the Risk Committee, the Credit Committee, the Audit and Examination Committee, and on the Governance and Nominating Committee.

23.     Defendant Elizabeth A. Duke is believed to be a citizen and resident of the Commonwealth of Virginia.  Since 2015, defendant Duke has served as a member of the Board, and has served on its Risk Committee, the Credit Committee, and Finance Committee.

24.     Defendant Donald M. James is believed to be a citizen and resident of the State of

8

Alabama.  Since 2009, defendant James has served as a member of the Board, and has served on its Human Resources Committee and the Finance Committee.

25.     Defendant James H. Quigley is believed to be a citizen and resident of the State of Utah.  Since 2013, defendant Quigley has served as a member of the Board, and has served as Chairman of its Audit and Examination Committee, the Risk Committee, and the Credit Committee.

26.     Defendant Federico F. Peña is believed to be a citizen and resident of the State of Colorado.  From 2011 to 2018, defendant Peña served as a member of the Board, and was Chairman of its Corporate Responsibility Committee, the Audit and Examination Committee, the Risk Committee and the Governance and Nominating Committee.

27.     Defendant Suzanne M. Vautrinot is believed to be a citizen and resident of the State of Colorado.  Since 2015, defendant Vautrinot has served as a member of the Board, and has served on its Audit and Examination Committee and the Credit Committee.

28.     Defendant Enrique Hernandez, Jr. is believed to be a citizen and resident of the State of California.  From 2003 to 2018, defendant Hernandez served as a member of the Board, and was Chairman of its Risk Committee, the Corporate Responsibility Committee, the Finance Committee and the Audit and Examination Committee.

29.     Defendant Celeste A. Clark is believed to be a citizen and resident of the State of Michigan.  Since 2018, defendant Clark has served as a member of the Board and has served on its Corporate Responsibility Committee.

30.     Defendant Theodore F. Craver is believed to be a citizen and resident of the State of California.  Since 2018, Craver has served as a member of the Board and has served on its Audit and Examination Committee.

31.     Defendant Maria R. Morris is believed to be a citizen and resident of the State of New York.   Since 2018, Morris has served as a member of the Board and has served on its Risk

9

Committee.

32.     Defendant Karen B. Peetz is believed to be a citizen and resident of the State of New York.  Since 2017, Peetz has served as a member of the Board and has served on its Finance Committee, Human Resources Committee, and Risk Committee.

33.     Defendant Juan A. Pujadas is believed to be a citizen and resident of the State of New York.  Since 2017, Pujadas has served as a member of the Board and has served on its Credit Committee, Finance Committee, and Risk Committee.

34.     Defendant Ronald L. Sargent is believed to be a citizen and resident of the Commonwealth of Massachusetts.  Since 2017, Sargent has served as a member of the Board and has served on its Audit and Examination Committee, Governance and Nominating Committee, and Human Resources Committee.

35.     Defendant Stephen W. Sanger is believed to be a citizen and resident of the State of New York.  From 2003 to 2018, he served as a member of the Board.  He was on its Human Resources Committee, the Risk Committee and the Governance and Nominating Committee.  In October 2016, he became Chairman of the Board.  On August 15, 2017, it was announced that Sanger would step down in 2018.

36.     Defendant John G. Stumpf is believed to be a citizen and resident of the State of California. He served as Wells Fargo's Chief Executive Officer from June 2007 until his resignation on October 12, 2016, as Chairman of the Board from January 2010, and as a Director from 2006, until the time of his resignation. Stumpf was the Company's President from August 2005 to November 2015, and Chief Operating Officer from August 2005 to June 2007.

37.     Defendant Timothy J. Sloan is believed to be a citizen and resident of the State of California, has served as Wells Fargo's CEO since October 2016. He previously served at various times as the Company's President and Chief Operating Officer, Senior Executive Vice President, Wholesale Banking, Senior Executive Vice President and Chief Financial Officer,

10

Senior Executive Vice President and Chief Administrative Officer from September 2010 to February 2011. He previously held various positions with the Company or its predecessors beginning in 1988. From 2011 to 2015, Wells Fargo paid Sloan more than $40 million in salary, stock awards, and other compensation.

38.    Defendant Susan G. Swenson is believed to be a citizen and resident of the State of California.  From November 1998 to 2018, she was a member of the Board, and served on its Audit and Examination Committee from at least March 2010, and on its Governance and Nominating Committee from at least 2006.

39.    Defendant Carrie L. Tolstedt is believed to be a citizen and resident of the State of California.  She served as Wells Fargo's Senior Executive Vice President, Community Banking from June 2007 to July 2016. Before serving as Senior Executive Vice President, Tolstedt served at various times as Group Executive Vice President, Community Banking, and Group Executive Vice President, Regional Banking from 2002 to 2006 and in various other positions since 1990.

40.    Defendant John R. Shrewsberry is believed to be a citizen and resident of the State of California.  He has served as Wells Fargo's Senior Executive Vice President and CFO since May 2014. Shrewsberry previously served as Head of Wells Fargo Securities from 2009 to May 2014 and held various other positions with the Company beginning in 2001.

41.    Defendant Michael J. Loughlin is believed to be a citizen and resident of the State of California.  He has served as Senior Executive Vice President since July 2011 and Chief Risk Officer of Wells Fargo since 2006. Loughlin oversees all risk-taking activities at Wells Fargo, including credit, market, operational, and compliance. Loughlin is the leader of the Corporate Risk group and is a member of Wells Fargo's Operating and Management Committees.

42.    Defendant Cynthia H. Milligan, is believed to be a citizen and resident of the State of California.  She was a member of the Board from July 1992 to 2018.  She served as Chairman of its Credit Committee since at least March 2010; on the Corporate Responsibility Committee

Amended Complaint

since January 2011; on the Risk Committee since January 2011, including as Chairman of that Committee from January 2011 to at least March 2011; and on the Governance and Nominating Committee since at least 2005. She also served on the Audit and Examination Committee from at least March 2010 to at least March 2011.

43.     Defendant Elaine L. Chao is believed to be a citizen and resident of the State of Kentucky.  She served as a member of the Board from July 2011 until January 2017 and served on its Credit Committee since at least March 2013 and served on its Corporate Responsibility Committee from July 2011 to at least March 2012.

44.     Defendant Susan E. Engel is believed to be a citizen and resident of the State of California.  She served as a member of the Board from May 1998 until August 2017.  She served on its Credit Committee, its Finance Committee, and its Human Resources Committee since at least March 2010.

45.     Defendant Judith M. Runstad is believed to be a citizen and resident of the State of California.  She served as a member of the Board from May 1998 to April 2016 and served on its Corporate Responsibility Committee from January 2011 to April 2016, including as Chairman from at least March 2012 to at least March 2015; on its Credit Committee from at least March 2010 to April 2016; on its Risk Committee from at least March 2012 to at least March 2015; and on its Finance Committee since at least March 2012.

46.     Defendant Franklin Codel ("Codel") is believed to be a citizen and resident of the State of California.   Until he was fired in November of 2017, defendant Codel (who had been employed by Wells Fargo since 1993), was an Officer of the Company and a member of its Operating Committee.  Defendant Codel also headed Wells Fargo's Consumer Lending Group, which includes Wells Fargo Dealer Services (the Bank's automobile lending business) and the Bank's Mortgage Finance Group, which includes the residential mortgage business. Codel previously led Wells Fargo's (2004-2011) and Mortgage Production (2011-2015) divisions,

while serving as  Executive Vice President of the Consumer Lending Group's Home Lending division. Defendant Codel thus served in a supervisory capacity with the very Wells Fargo units and divisions in which the forced placement auto insurance scandal that is the subject matter of this action occurred, as well as the residential mortgage divisions in which a similarly massive forced place insurance scandal had earlier occurred.

47.     Defendant Dawn Martin Harp ("Harp"), is believed to be a citizen and resident of the State of California. Until she retired in 2017, defendant Harp was an Officer of the Company and a member of its Management Committee, and served as the Executive Vice President of the Dealer Services Division. Defendant Harp previously served as the Chief Operating Officer of Dealer Services from 2006-to 2011.

48.     Defendant Avid Modjtabai ("Modjtabai") is believed to be a citizen and resident of the State of California.  Defendant Modjtabai is an Officer of the Company, a Senior Executive Vice President, a member of its Operating Committee, and is currently serving as the head of the Bank's Payments, Virtual Solutions and Innovation Group.  Defendant Mofjtabai previously served as the head of the Bank's Operations Group and its Consumer Lending Group.  While head of the Consumer Lending Group, defendants Martin Harp and Codel reported to Modjtabai. Modjtabai previously served as the head of the Technology and Operations Group and as Chief Information Officer.

49.     At time relevant to the claims asserted in this Complaint, the following individual defendants were members of Wells Fargo's Operating Committee: Stumpf, Sloan, Codel, Modjtabai, Loughlin, and Shrewsberry. According to the Corporate Governance Guidelines of the Wells Fargo Board, "non-Board members who are members of the Company's Operating Committee regularly attend Board and most committee meetings."

**B.     Defendants National General Holdings Corp.**

       **and National General Insurance Company**

Amended Complaint

50.     Defendant National General Holdings Corp. ("NGHC") is a corporation incorporated under the law of the State of Delaware with its principal place of business located in New York, New York. Defendant NGHC is a holding company and the parent corporation of defendant National General Insurance Company ("NGIC").

51.     Defendant National General Insurance Company (or "NGIC"), a wholly owned subsidiary of defendant NGHC, is a corporation incorporated under the laws of the State of Missouri. NGIC maintains its principal place of business in Winston-Salem, North Carolina. Defendant NGIC is engaged in the business of underwriting and selling CPI policies throughout the United States on behalf and for the benefit of NGHC.  Relatedly, NGHC administers the CPI division of the National General Lender Services.  Plaintiff alleges, on information and belief, that National General was an outside service provider for all aspects of Wells Fargo's CPI program, as described below, during the period 2011 to 2016, and the scope of its services included insurance tracking, borrower identification, and policy placement, which it conducted and performed throughout the United States.

52.     NGHC and NHIC are named as defendants herein in their individual capacities and as successors in interest to two additional insurance companies whose assets and liabilities they acquired.  All references in this Complaint to "NGHC" and "NHIC" are intended to cover as well the acts and omissions of QBE North America ("QBE") and Balboa Insurance Company ("Balboa").

53.     In or about 2015, defendant NGHC announced that it was acquiring the assets and liabilities of insurance company QBE, which reportedly served as the outside service provider and as an underwriter for Wells Fargo's lender placed CPI program, at least during the period from 2011 to 2015, and the scope of its services included insurance tracking, borrower identification, and policy placement.  In or about June of 2011, QBE acquired the assets and liabilities of Balboa from Bank of America.   Balboa reportedly served as the outside service

14

provider and as an underwriter for Wells Fargo's lender placed CPI program, at least during the period 2005 to 2011, and the scope of its services included insurance tracking, borrower identification, and policy placement.

**C.    Nominal Defendant Wells Fargo**

54.    Nominal Defendant, Wells Fargo, is a corporation incorporated under the laws of the State of Delaware. Wells Fargo maintains its principal executive offices in San Francisco, California. It is solely a Nominal Defendant and no claims are alleged herein against it. This action is brought by plaintiff on the Company's behalf.

55.    Most of Wells Fargo's business operations are carried out through the Bank. The Bank is reported to be the second largest bank in the world, with assets of nearly $2 trillion, and corporate equity of over $200 billion.

56.    According to Wells Fargo's Report on Form 10-K for the year ended December 31, 2016 ("2016 10-K"), the Company generally describes its business and operations as a sprawling global enterprise engaged in many diverse business lines and operating segments:

> "We are a diversified financial services company. We provide retail, commercial and corporate banking services through banking locations and offices, the internet and other distribution channels to individuals, businesses and institutions in all 50 states, the District of Columbia and in other countries. We provide other financial services through subsidiaries engaged in various businesses, principally: wholesale banking, mortgage banking, consumer finance, equipment leasing, agricultural finance, commercial finance, securities brokerage and investment banking, insurance agency and brokerage services, computer and data processing services, trust services, investment advisory services, mortgage-backed securities servicing and venture capital investment.  We have three operating segments for management reporting purposes: Community Banking; Wholesale Banking; and Wealth and Investment Management."

Amended Complaint

57.     In reporting on its operations, the defendants do not disclose that, over the years, Wells Fargo, in the Board's quest for growth, has been expanded globally beyond the point that its members and senior management can oversee its business consistent with their fiduciary, stewardship and oversight responsibilities.  As such, the Company has become increasingly unmanageable and without sufficient controls to enable management and the Board to monitor its operations.

58.     The Company has three reportable operating segments: (i) Wholesale Banking, which provides financial solutions to businesses with annual sales generally in excess of $5 million; (ii) Wealth and Investment Management, which provides personalized wealth management, investment and retirement products and services, including financial planning, private banking, credit, investment management and fiduciary services to high-net worth and ultra-high-net worth individuals and families; and (iii) Community Banking -- the most-relevant to this case -- which was the Company's largest segment during the Relevant Period, and focused on diversified financial products and services to customers and small businesses, including checking and savings accounts, credit and debit cards, as well as auto, student, and small-business lending. Community Banking products also include investment, insurance, and trust services in 39 states and the District of Columbia, as well as mortgage and home equity loans in all 50 states.  During the Relevant Period, Community Banking reportedly earned approximately twice the annual revenue of Wholesale Banking and more than three times the revenue of Wealth and Investment Management.

59.     In addition, Wells Fargo's 2016 10-K (at Exhibit 13 thereof) represented as follows concerning the Company's history and operations and the Board's emphasis on ever-expanding worldwide growth:

> "Wells Fargo & Company is a diversified, community-based financial services company with $1.9 trillion in assets. Founded in 1852 and headquartered in San Francisco, we

16

provide banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,600 locations, 13,000 ATMs, digital (online, mobile and social), and contact centers (phone, email and correspondence), and we have offices in 42 countries and territories to support customers who conduct business in the global economy. With approximately 269,000 active, full-time equivalent team members, we serve one in three households in the United States and ranked No. 27 on Fortune's 2016 rankings of America's largest corporations. We ranked third in assets and second in the market value of our common stock among all U.S. banks at December 31, 2016.

We use our Vision and Values to guide us toward growth and success. Our vision is to satisfy our customers' financial needs, help them succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies. We aspire to create deep and enduring relationships with our customers by providing them with an exceptional experience and by discovering their needs and delivering the most relevant products, services, advice, and guidance.

We have five primary values, which are based on our vision and provide the foundation for everything we do. First, we value and support our people as a competitive advantage and strive to attract, develop, retain and motivate the most talented people we can find. Second, we strive for the highest ethical standards with our team members, our customers, our communities and our shareholders. Third, with respect to our customers, we strive to base our decisions and actions on what is right for them in everything we do. Fourth, for team members we strive to build and sustain a diverse and inclusive culture – one where they feel valued and respected for who they are as well as for the skills and experiences they bring to our company. Fifth, we also look to each of our team members to be leaders in establishing, sharing and communicating our vision. In addition to our

Amended Complaint

five primary values, one of our key day-to-day priorities is to make risk management a

competitive advantage by working hard to ensure that appropriate controls are in place to

reduce risks to our customers, maintain and increase our competitive market position, and

protect Wells Fargo's long-term safety, soundness and reputation."

https://www.sec.gov/Archives/edgar/data/72971/000007297117000278/wfc-

12312016xex13.htm.


**IV.    THE INDIVIDUAL DEFENDANTS'OBLIGATIONS TO WELLS FARGO**

60.    By reason of their positions as directors of Wells Fargo (and in the case of defendants

Sloan, Tolstedt, Shrewsberry, Loughlin, Codel, Harp, and Modjtabai as senior officers of the

Company and/or the Bank) and because of their ability to control the business and corporate

affairs of the Company and/or the Bank their positions of oversight over the their operations, the

Individual Defendants (including the Officers identified in this Complaint) owed the Company

and its shareholders the fiduciary obligations of good faith, loyalty, prudence, due care, candor

and diligence.  They were required to use their utmost ability to exercise reasonable and prudent

supervision over the affairs of the Company in a loyal, diligent, informed, fair, just, competent,

ethical and legal manner.  All Individual Defendants have and had an obligation to act at all

times in the best interests of Wells Fargo, and to subordinate their individual self-interest to the

paramount interests of the Company.  Each such Individual Defendant failed to do so.

61.    Each Individual Defendant, as a director and/or senior officer of Wells Fargo and/or the

Bank, had and (to the extent such person still serves in such position continues to have) an

obligation to take reasonable steps to investigate and, if appropriate, cause the Company to assert

any and all valid claims and causes of action that it has, or had, against persons and entities

arising from the misconduct as alleged in this Complaint.   Such defendants also had an

18

obligation to take reasonable and prudent steps to preserve the Company's ability to assert potential claims as they were being evaluated and considered so that any such claims (or potential claims) do or did not lapse, or become stale, due to the passage of time.  Each such Individual Defendant failed to do so.

62.     In addition to their obligations as set forth above, each Individual Defendant was bound to implement, enforce and execute corporate policies and rules of corporate governance applicable to him or her, including the obligations set forth in Wells Fargo's codes of conduct, corporate governance, as well as the charters and foundational documents of the Committees on which they served, as summarized in this Complaint.

63.     The Wells Fargo's Code of Ethics states that the Company's "reputation as one of the world's great companies for integrity and principled performance depends on our doing the right thing, in the right way, and complying with the laws, rules and regulations that govern our business. We earn trust by behaving ethically and holding all team members and directors accountable for the decisions we make and the actions we take. The Code of Ethics serves to guide the actions and decisions of our team members, including executive officers, and directors consistent with our company vision and values." See https://www.wellsfargo.com/about/corporate/governance/.

64.     The Code of Ethics further states, in relevant part:

"Our ethics are the sum of all the decisions each of us makes every day. We have a responsibility to always act with honesty and integrity. When we do so, we earn the trust of our customers. We have to earn that trust every day by behaving ethically, rewarding open, honest communication, and holding ourselves accountable for our decisions and actions.

"We want to be approachable and caring, exceed our customers' expectations, and invest in relationships that last a lifetime. Our customers are always our priority. Our customer

19

focus is one of the characteristics that distinguishes us from our competitors….

We are all accountable for complying with the Code, as well as all company policies and applicable laws, rules, and regulations that apply to us. Likewise, we are all accountable for our decisions and actions, especially managing the risks inherent in our roles and appropriately escalating issues and violations of which we become aware. If mistakes are made, we acknowledge them and act to correct them…

We do not engage in or tolerate retaliation of any kind against anyone for providing information in good faith about suspected unethical or illegal activities, including possible violations of this Code, violations of laws, rules, or regulations by others, or concerns regarding accounting, internal accounting controls, or auditing matters. If you think that you or someone you know has been retaliated against, contact any of the resources listed in this Code.

We must be honest and fair in our dealings and communications with our customers, as well as with third---- party service providers, competitors and each other. We provide our customers and prospective customers with advice, service, and many products, and we are committed to making financial products and services available to them on a fair, transparent, and consistent basis, and to conducting business in a responsible manner.

Products provided to our customers should be in the customer's best interest, must be explained in a way that the customer can understand, and the terms must be thoroughly and accurately outlined.

Steering a customer to an inappropriate or unnecessary product to receive sales credit may harm the customer and is a violation of the [Ethics] Code.

Manipulating or misrepresenting sales, reporting, or customer information is a violation of the [Ethics] Code.

Know the sales referral and compensation guidelines that are applicable to your role.

Never engage in unfair, deceptive, or abusive acts or practices."

https://www08.wellsfargomedia.com/assets/pdf/about/corporate/code-of-ethics.pdf.

The Individual Defendants blatantly have violated Wells Fargo's Code of Ethics.

65.   The Individual Defendants also have violated blatantly Wells Fargo's Risk Charter, as follows:

"The purpose of the Risk Committee is to provide oversight of the Company's enterprise-wide risk management framework and Corporate Risk function, including the strategies, policies, procedures, processes, and systems, established by management to identify, assess, measure, monitor, and manage the major risks facing the Company. The Committee shall assist the Board of Directors and its other committees that oversee specific risk-related issues and serve as a resource to management by overseeing risk across the entire Company and across all risk types, and by enhancing management's and the Board's understanding of the Company's overall risk appetite and enterprise-wide risk management activities and effectiveness.

While the Committee has the authority and responsibilities set forth in this Charter, management is responsible for designing, implementing and maintaining an effective risk management framework. . .

The Committee shall meet periodically in separate executive sessions with the Chief Risk Officer and other members of management as it determines appropriate. The Chief Risk Officer is expected to communicate with the Chair on any significant risk issues that arise between Committee meetings, including issues raised by management's Enterprise Risk Management Committee. In addition, each of the members of the Board's other committees is expected to bring to the attention of his or her committee Chair, or the

21

Chief Risk Officer, any risk issues that such committee member believes should be discussed by the Committee. . .

Emerging Risks and Other Risk Issues. The Committee shall receive regular reports from the Chief Risk Officer and other members of management regarding emerging risks and other selected risk topics and/or enterprise-wide risk issues, including model risk. The Committee may request that the Board and/or another committee of the Board review, discuss and assume oversight responsibility for any newly identified risk issues."

https://www08.wellsfargomedia.com/assets/pdf/.../corporate/risk-committee-charter.pdf.

66.    In a similar vein:

"The Board's Audit & Examination Committee has primary oversight responsibility for all aspects of operational risk. In this capacity, in addition to the Board's Risk Committee, it reviews and approves the operational risk management framework and significant supporting operational risk policies and programs, including the Company's business continuity, financial crimes, information security, privacy, regulatory compliance, technology, and third-party risk management policies and programs. In addition, it periodically reviews updates from management on the overall state of operational risk, including all related programs and risk types. * * * * *The Audit & Examination Committee additionally oversees the internal audit function, external auditor performance, and the disclosure framework for financial and risk reports prepared for the Board, management, and bank regulatory agencies.

* * * * *

Oversight includes:

•    Internal control over financial reporting

•    Disclosure framework for financial and risk reports prepared for the Board,

Amended Complaint

1    management and bank regulatory agencies

2    •    External auditor performance

3    •    Internal audit function, including performance of the Chief Auditor

4    •    Operational risk, compliance with legal and regulatory requirements, financial

5    crimes risk (BSA/AML), information security risk (including cyber), and

6    technology risk, including through approval (and recommendation to the Risk

7    Committee) of the relevant functional framework and oversight policies

8

9    •    Ethics, business conduct, and conflicts of interest program

10   •    Resolution planning"

11   https://www08.wellsfargomedia.com/.../audit-and-examination-committee-charter.pdf.

12   67.    Likewise, the purpose and responsibilities of the Board's Corporate Responsibility

13   Committee ("CRC") are to:

14

15   •    "oversee the Company's policies, programs, and strategies regarding social

16   responsibility matters of significance to the Company and the public at large, including

17   the Company's community development and reinvestment activities and performance,

18   fair and responsible lending, government relations, support of charitable organizations,

19   and environmental issues;

20

21   •    monitor the Company's relationships with external stakeholders regarding

22   significant social responsibility matters, and advise the Board of Directors and

23   management on strategies that affect the Company's role and reputation as a socially

24   responsible organization; and

25   •    monitor the Company's reputation generally, including with customers.

26

27   * * * * *

28

Amended Complaint

23

Oversight includes:

• Reputation risk, including through approval (and recommendation to the Risk Committee) of the reputational risk functional framework and oversight policy

• Customer service and complaint matters, including related to the Company's culture and its team members' focus on serving customers

• Fair and responsible mortgage and other consumer lending reputational risks

• Social responsibility risks, including political and environmental risks"

https://www08.wellsfargomedia.com/.../about/corporate/corporate-responsibility-com.

68. Similarly, with respect to the Board's Governance and Nominating Committee:

"The purpose of the Governance and Nominating Committee ("GNC") is to assist the Board of Directors in fulfilling its responsibilities to oversee the composition of the Board and its committees and the Company's corporate governance practices, including by:

• identifying individuals qualified to become Board members, and to recommend to the Board nominees for director;

• recommending to the Board a determination of each outside director's "independence" under applicable rules and guidelines;

• recommending to the Board director nominees for each committee;

Amended Complaint

- recommending to the Board the corporate governance guidelines applicable to the Company;

- overseeing an annual review of the Board's performance;

- reviewing from time to time director compensation and recommend any changes for approval of the Board;

- overseeing the Company's engagement with stockholders and other interested parties concerning governance and other related matters; and

- overseeing reputation risk related to the GNC's responsibilities described in this Charter."

https://www08.wellsfargomedia.com/assets/pdf/about/corporate/governance-and-nominating-committee-charter.pdf.

69.     Additionally, with respect to the Board's Human Resources Committee:

"The purpose of the Human Resources Committee ("HRC") is to assist the Board of Directors in fulfilling its responsibilities relating to the overall compensation strategy for the Company and the compensation of the Company's executive officers, including to: approve the Company's compensation philosophy and principles;

- conduct the annual Chief Executive Officer performance evaluation process;

- evaluate and approve compensation plans, policies and programs of the Company applicable to executive officers;

- oversee the Company's incentive compensation risk management program and practices for senior executives and employees in a position, individually or collectively, to expose the Company to material financial or reputational risk;

- oversee the Company's human capital management, including talent management and succession planning;

- oversee the Company's culture;

- oversee the Company's Code of Ethics and Business Conduct and ethics, business conduct and conflict of interests program; and

- oversee reputation risk related to the HRC's responsibilities described in this Charter.

In addition, the HRC reviews and approves the Compensation Committee Report included in the Company's proxy statement in accordance with Securities and Exchange Commission rules."

https://www08.wellsfargomedia.com/assets/pdf/about/corporate/human-resources-committee-charter.pdf.

70.     With respect to the Board's Risk Committee:

"Our Board oversees the alignment of team member conduct to the Company's risk appetite (which the Board approves annually) and culture as reflected in our Vision and Values and Code of Ethics and Business Conduct.  The Board's Risk Committee has primary oversight responsibility for enterprise-wide conduct risk, while certain other Board committees have primary oversight responsibility for specific components of conduct risk.  At the management level, several committees have primary oversight responsibility for key elements of conduct risk, including internal investigations, sales practices oversight, complaints oversight, and ethics oversight. These management-level committees have escalation and informational reporting paths to the relevant Board committee.

Our Conduct Management Office, which reports to our Chief Risk Officer and has an informational reporting path to the Board's Risk Committee, is responsible for fostering and promoting an enterprise-wide culture of prudent conduct risk management and compliance with internal directives, rules, regulations, and regulatory expectations

throughout the Company and to provide assurance that the Company's internal operations and its treatment of customers and other external stakeholders are safe and sound, fair, and ethical.

* * * * *

Oversight includes:

•   Enterprise-wide risk management framework and structure, including through approval of the risk management framework which outlines the Company's approach to risk management and the policies, processes and governance structures necessary to execute the risk management program

•   Risk functional framework and oversight policies, which outline roles and responsibilities for managing key risk types and the most significant cross-functional risk areas, including counterparty credit risk

•   Corporate Risk function, including performance of the Chief Risk Officer

•   Risk coverage statement

•   Aggregate enterprise-wide risk profile and alignment of risk profile with Company strategy, objectives, and risk appetite

•   Risk appetite statement, including changes in risk appetite, and adherence to risk limits

•   Risks associated with acquisitions and significant new business or strategic initiatives

•   Liquidity and funding risks, emerging risk, strategic risk, and other selected risk topics and enterprise-wide risk issues, including model risk

•   Volcker compliance program

•   Through joint meetings with the Audit & Examination Committee, information security risk (including cyber) and technology risk"

https://www08.wellsfargomedia.com/assets/pdf/about/corporate/risk-committee-charter.pdf.

71.     In addition to their general duties and responsibilities under Delaware corporate law and Wells Fargo's own corporate governance principles as promulgated over the years (and as set forth in Wells Fargo's principles of corporate governance as set forth above), the Individual Defendants and their predecessors also had substantial obligations under federal regulatory regimens. For example, the Federal Deposit Insurance Corporation ("FDIC") has enumerated the duties of bank directors as follows:

> "Th[e] [fiduciary duties of care and loyalty mean] that directors are responsible for selecting, monitoring, and evaluating competent management; establishing business strategies and policies; monitoring and assessing the progress of business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; and for making business decisions on the basis of fully informed and meaningful deliberation."

40 Financial Institution Letter, FIL--87—92 (FDIC Dec. 3, 1992) available at https: ///www.fdic.gov/regulations/laws/rules/5000-3300.html.

72.     Likewise, the Office of the Comptroller of the Currency ("OCC") has directed that:

> "While holding companies of large banks [such as Wells Fargo] are typically managed on a line of business basis, directors at the bank level are responsible for oversight of the bank's charter-the legal entity. Such responsibility requires separate and focused governance. We have reminded the boards of banks that their primary fiduciary duty is to ensure the safety and soundness of the national bank or federal savings association. This responsibility involves focus on the risk and control infrastructure. Directors must be certain that appropriate personnel, strategic planning, risk tolerance, operating processes, delegations of authority, controls, and reports are in place to effectively oversee the performance of the bank. The bank should not simply function as a booking entity for the

28

holding company. It is incumbent upon bank directors to be mindful of this primary

fiduciary duty as they execute their responsibilities."

Testimony of Thomas J. Curry, Comptroller of the Currency, before the Financial Services

Committee, U.S. House of Representatives (June 19, 2012), available at

https://occ.gov/newissuances/congressional-testimony/2012/pub-test-2012-91-written.pdf.

## V.   PERVASIVE WRONGDOING AND LACK OF OVERSIGHT

**A.   Cross-Selling and the Board's Knowledge
of Illegal Sales Activity Prior to 2013**

73.   Cross-selling, *i.e.,* the ability to sell new products to existing customers, has been critical

to the financial success of Wells Fargo.  The Company's 2006 Annual Report stated that "cross-

selling" "is the foundation of [its] business model and key to [its] ability to grow revenue and

earnings."  The 2007 Annual Report, likewise, explained that the Bank's cross-sell strategy will

"facilitate growth in strong and weak economic cycles" and announced that the Bank was

"known across industry as number one, second to none, for cross-sell and revenue growth."  The

2010 Annual Report called the Company "the king of cross-sell."  The 2013 Annual Report

announced that the Company generated "record earnings" because it "achieved record cross-sell

across the Company."  In its 2013 Form 10-K filing, the Company proclaimed that cross-selling

"is a key part of our growth strategy, and our failure to execute this strategy effectively could

have a material adverse effect on our revenue growth and financial results."

74.   Cross-selling numbers nearly doubled between 1998 and 2014.  The Company imposed

sales goals on its bankers to sell eight products per household which created substantial pressure

to open multiple accounts per customer.  An employee sent letters to defendant Stumpf and the

Board's Audit and Examination Committee in September 2007 complaining that the Gr-Eight

initiative drove employees to engage in unlawful account-creation practices.

75.   Between 2008 and 2013, five lawsuits were filed against the Company regarding

unauthorized account-creation practices.  In 2011, Wells Fargo terminated approximately 1,000 employees in retail banking for improper sales practices.  Also in 2011, Rasheeda Kamar e-mailed defendant Stumpf complaining about her firing as branch manager, after she failed to meet sales quotas because she refused to create fake accounts.  Likewise, Ricky Hansen, another branch manager, e-mailed defendant Stumpf reporting his firing for improperly looking up fraudulent account information, requested by the Bank's EthicsLine.

76.    In January 2012, the OCC started examining Wells Fargo's governance process and risk management practices related to compliance and operational risk.

77.    Upon information and belief, the Individual Defendants in the retail operations of the Bank were motivated to perpetuate the unlawful account-creation practices, in order to maintain its leadership in cross-selling and the Company's inflated stock price.  The Board approved compensation programs that incentivized the unauthorized account openings for years.

**B.    The Los Angeles Times Article in 2013**

78.    On December 21, 2013, *The Los Angeles Times* ran an article entitled "Wells Fargo's pressure-cooker sales culture comes at a cost", describing the Bank's "questionable" sales culture and practices.  The article reported:

"The relentless pressure to sell has battered employee morale and led to ethical breaches, customer complaints and labor lawsuits…To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork. Some employees begged family members to open ghost accounts. These conclusions emerge from a review of internal bank documents and court records, and from interviews with 28 former and seven current Wells Fargo employees who worked at bank branches in nine states, including California…. 'I'm not aware of any overbearing sales culture,'[then] Chief Financial Officer Timothy Sloan said in an interview."

Amended Complaint

79.    All members of the Board were or should have been aware of this article.  In September 2016, defendant Stumpf admitted under oath before the United States House of Representatives Financial Services Committee that the Board had discussed the article at the time of its publication.

**C.    The Board's Knowledge of the Fake Accounts
       and Misstatements in Public Filings in 2014 and 2015**

80.    In 2014, the OCC identified the need for the Board to examine cross-selling and the Company's sales practices and directed the Bank to address compliance risk weaknesses.

81.    In February 2015, the OCC conducted an investigation into the Bank's Community Bank Operational Risk Management, which led to the April 2015 Supervisory Letter whereby the OCC identified the need for the Board to address the governance of sales practices within the Community Banking division.

82.    In March 2015, the OCC determined that the Board needed to improve its operational and compliance risk governance and risk management. The Board was put on renewed notice of the facts uncovered by the 2013 Los Angeles Times article with the May 4, 2015 filing by Los Angeles City Attorney, Michael Feuer, of a civil enforcement action on behalf of California consumers challenging the unauthorized account-creation scheme. A settlement was reached in September 2016 whereby Wells Fargo agreed to pay restitution to all harmed customers, and $50 million in civil penalties, and to establish policies and procedures that require Wells Fargo employees to provide information to customers about their accounts.

83.    The OCC issued a Supervisory Letter to defendant Stumpf in June 2015 outlining required corrective action required by the Bank, including the need to address the lack of appropriate controls over cross-selling, the lack of an oversight program for sales practices, and the failure of audit services to identify these problems.

84.    In July 2015, the OCC issued a Report of Examination, followed by a Notice of

Amended Complaint

Deficiency, admonishing the Board for its failure to address control of risks.

85.     In August 2015, at the urgings of regulators and the Los Angeles City Attorney's Office, Wells Fargo retained PricewaterhouseCoopers, LLP ("PWC") to "investigate" fraudulent sales practices at the Bank.

86.     PWC determined that approximately 5,300 Bank employees had been fired for improper selling, many for merely being internal "whistleblowers."   PWC also discovered there were approximately 1.5 million unauthorized deposit accounts and 565,000 unauthorized consumer credit card accounts, and approximately 115,000 accounts incurred $2.6 million in fees.

87.     Neither Wells Fargo nor any of the Individual Defendants disclosed the PWC investigation or its findings in SEC filings and it was not made public until September 2016. According to Randy Holbrook, a personal banker in Florida, the daily routine and pressure to drum up business remained essentially the same as it had been previously.

88.     A November 2015 OCC Consent Decree recited "deficiencies in an internal control pillar of the Bank's program for BSA/AML compliance covering the Wholesale Banking Group line of business," and observed that Wells Fargo's "[g]overnance and oversight practices are not effective."

89.     Despite the Board's knowledge of the fake account scheme back in 2013, and the litigations and regulatory investigations, neither defendant Stumpf nor any of the Individual Defendants disclosed the illegal activities in SEC filings.  Defendant Stumpf admitted under oath before the United States Senate Banking Committee on September 20, 2016 that he did not initiate any investigation when he first learned about the illicit account creation scheme.  He said: "It was early in 2014…that we finally connected a dot, and there's no excuse why we didn't connect it before."  Sept. 20, 2016, Senate Banking Committee Hearing Tr. At 11.

**D.     The Public Disclosure of the Cross-Selling Scandal in 2016**

90.     In July 2016, the OCC issued a Report of Examination, determining that the Bank's sales

32

Amended Complaint

practices were unethical, the Bank's actions caused harm to consumers, and Bank management had not responded promptly to address the issues previously identified by the OCC.

91.     On July 18, 2016, the OCC sent a Supervisory Letter to defendant Stumpf that the Bank engaged in unsafe and unsound banking practices.

92.     On September 1, 2016, in a consent order issued with the Board's consent, the OCC fined the Company in the amount of $35 million as a result of the illicit account creation scheme for "reckless unsafe or unsound sales practices that were part of a pattern of misconduct."

93.     On September 8, 2016, the United States Consumer Financial Protection Bureau ("CFPB") levied a $100 million penalty against Wells Fargo, in a consent order, issued with the Board's consent, for the widespread "unfair" and "abusive" practice since 2011 of secretly opening hundreds of thousands of unauthorized deposit and tens of thousands of credit card accounts, in violation of the Consumer Financial Protection Act, and the Board was made fully aware of the fact that approximately 5300 employees had been terminated in that period for wrongful sales practices.

94.     As former CFPB Director Richard Cordray said in announcing his agency's action: "Wells Fargo employees secretly opened unauthorized accounts to hit sales targets and receive bonuses….Because of the severity of these violations, Wells Fargo is paying the largest penalty the CFPB has ever imposed. Today's action should serve notice to the entire industry that financial incentive programs, if not monitored carefully, carry serious risks that can have serious legal consequences."

95.     Following the public disclosure of the settlement between the Company and the CFPB, federal and state prosecutors, including the California Attorney General, United States Attorneys in San Francisco, New York and Charlotte announced that criminal investigations of the Bank have been commenced.

96.     A congressional investigation into the illicit account-creation scheme was initiated.

33

Wells Fargo's written responses to questions posed by the Senate Banking Committee stated that the Board's Audit and Examination Committee received several reports from 2011 discussing the "increases in sales integrity issues or in notifications to law enforcement in part relating to the uptick in sales integrity issues."  The Company also admitted that the Board's Risk Committee and Human Resources Committee received reports that management was monitoring sales integrity in Community Banking, and that sales integrity issues were discussed periodically by the Board.

97.     On September 20, 2016, defendant Stumpf testified under oath before the Senate Banking Committee that he did not learn about the fictitious accounts until 2013 and the Board learned about it after him in 2013 and 2014.  Defendant Stumpf admitted that Wells Fargo's internal reports about illicit fraudulent account "got to the board level – it got to the corporate level in 2013 because progress was not being made. And the board level in '14."  He stated that the Board learned "sometime in 2013" that the risk, audit, and corporate responsibility committees were made aware of this wrongful conduct in 2014.  Senator Pat Toomey (R-PA) said during the hearing: "Wells Fargo wasn't cross-selling.  Failing to notify these customers about these sham accounts, this isn't cross-selling, this is fraud."

98.     In a September 28, 2016 letter, Senators Warren, Merkley and Menendez asked the SEC to commence a securities fraud investigation, stating that:

> "Mr. Stumpf admitted that he became aware of widespread fraud at the bank in 2013, yet neither he nor the company disclosed that information to investors until the CFPB Consent Order became public in September 2016.  In the interim, during quarterly earnings calls, Mr. Stumpf personally touted Wells' cross-sell ratio…as well as Wells' success in opening new deposit account and credit card accounts.  He did so apparently with knowledge that many of these retail accounts were created without customer authorization."

34

99.     In later testimony before the House Financial Services Committee on September 29, 2016, defendant Stumpf testified that "[t]he Board was made aware, generally, of issues by committee, at high levels in the 2011, '12 time frame.  By 2013, we had talked about maybe in one – I can't remember which committee it was, surely by 2014, and then when we finally connected the dots on customer harm in'15, the board was very active on this."

100.    In a September 27, 2016 article in *The New York Times*, Gretchen Morgenson wrote: "A corporate board has many duties, but three of the most crucial are at the center of the Wells Fargo mess. One is to assess the risks inherent in the company's business and handle them before they develop into a crisis.  Another is to dispense compensation that does not encourage bad behavior. And finally, a board must monitor a company's culture, from top to bottom.  The Wells Fargo board has disappointed in all three."

101.    Ms. Morgenson quoted Sheila C. Bair, the former chairwoman of the Federal Deposit Insurance Corporation: "Unfortunately, it appears that the bank's response was to view the problem as employee misconduct and to fire people as opposed to looking at the supervisory chain and culture."  "Culture and tone at the top are exactly what the board should be looking at."

102.    One member of Congress said on CNN on October 15, 2016, "Wells Fargo should be broken up as it's too big to manage."  She also pointed out what each member of the Board knew or should have known: "Wells Fargo pushed aggressive sales goals for low-wage employees that were so unrealistic and so unattainable that some felt pressured to commit crimes just to keep their jobs."

103.    On October 20, 2016, Senators Warren and Menendez wrote to the Board regarding defendant Stumpf's resignation and stated that "a resignation alone is not enough to assure proper accountability at Wells Fargo."  They raised concerns about defendant Sloan replacing Stumpf as the new CEO, stating:

Amended Complaint

"if Mr. Stumpf is simply replaced by another top company executive who was aware of, but did nothing to prevent the widespread fraud that harmed hundreds of thousands of Wells Fargo customers and shareholders, then the bank is turning its back on accountability."

104. On November 18, 2016, the OCC announced new sanctions, requiring Wells Fargo to seek advanced federal approval before hiring executives or offering severance payments.

105. The Court presiding over a related shareholder derivative lawsuit, denied the defendants' motions to dismiss in derivative litigation relating to the phony account scandal, and observed that the facts:

"support an inference that a majority of the Director Defendants, and in particular those Director Defendants who were on the risk committee, audit and examination committee, and corporate responsibility committee – knew about the widespread illegal activity and consciously disregarded their fiduciary duties to oversee and monitor the company.  As a result, they face a substantial likelihood of liability for Plaintiffs' breach of fiduciary duty claims."  Shaev v. Baker, Case No. 16-CV-5541-JST (N.D. Cal. May 4, 2017)(ECF No. 129 at p. 27).

106. Certain of the matters included in the Initial Demand and referred to in this Complaint, specifically including the unauthorized account opening scandal and certain proxy fraud claims, are also included in the Complaint that was the subject of the Court's ruling in *Shaev v. Baker*, Case No. 16-CV-5541-JST (N.D. Cal.), and in *In re Wells Fargo & Company Shareholder Derivative Litigation*, Lead Case No. 3:16-cv-05541-JST (N.D. Cal.). Unlike the plaintiff in this case, the plaintiffs in that action did not make a pre-suit demand before instituting suit. The plaintiffs instead relied upon their assertion that pre-suit demand was futile because the Wells Fargo Board faced a substantial prospect of personal liability with respect to these matters. The Court accepted their argument and denied the defendants' motion to dismiss on this ground in its

36

1    Order dated May 4, 2017, and that litigation is proceeding in accordance with the Scheduling

2    Order entered by the Court in that case. Plaintiff herein includes reference to the account opening

3    scandal and pre-2017 proxy violations in this Complaint as a further example of the Individual

4    Defendants' pervasive breaches of their duties and obligations to Wells Fargo and, most

5    significantly, to demonstrate the sham nature of the manner in which the Board and S&S

6    addressed plaintiff's Initial Demands. Plaintiff alleges no affirmative claim for damages on

7    account of the account opening scandal or pre-2017 proxy fraud claims; *i.e.,* no claims that

8    would be duplicative of the claims presently being pursued by plaintiffs in the Consolidated

9    Action.

10

11   **E.      Other Scandals Revealed in 2016**

12   107.    In 2016, Wells Fargo paid $1.2  billion to settle claims that it duped the federal

13   government into insuring thousands of risky mortgages in the years leading up to the housing

14   crash, commencing in 2007.  The Bank, with the knowledge of the Individual Defendants

15   serving at the time, engaged in a regular practice of reckless origination and underwriting of

16   FHA loans backed by federal insurance that was intended to help first-time home buyers.

17   Between 2001 and 2005, the Bank issued thousands of FHA loans that did not meet the

18   program's requirements and violated federal reporting requirements by keeping problem loans

19   concealed and collecting insurance payouts when loans were in default.  The loan defaults

20   caused the FHA to pay hundreds of millions of dollars in insurance claims to cover the Bank's

21   losses, even though the loans should not have been made in the first place.

22

23   108.    In the wake of the public exposure of Wells Fargo's "cross-selling" scandal as referred to

24   above, Prudential Financial, Inc. ("Prudential") ordered an intensified internal review of its

25   dealings with the Bank pursuant to which it sells life insurance policies to the Bank's retail

26   customers. According to a "whistleblower" complaint filed by three former Prudential managers

27   in the Superior Court of New Jersey Law Division for Essex County, *Broderick et al v The*

28

Amended Complaint

*Prudential Insurance Company of America, et al*., Superior Court, Essex County, NJ, Docket No. ESXL-8348-16, the Bank's employees appeared to have signed up customers for Prudential insurance without the customers' knowledge or permission and, in some cases, even arranged for monthly premium fees to be withdrawn from their customers' accounts. When Prudential investigators reviewed tapes of calls to its customer service line, they found complaints from customers of the Bank about policies they did not remember buying. Many customers spoke no English. Since the Bank's employees are not licensed to sell insurance, they were encouraged to steer customers to either a self-service kiosk in Bank branches or a website on which they could sign up for MyTerm, a policy that does not require applicants to take a medical exam.

109.    Indeed, according to a former Bank employee, Michael Barborek, of Orange Texas, "We were like insurance salespeople without the license." Consistent with the Bank's other "cross-selling" practices and compensation policies, those employees who sold as many as 15,000 MyTerm insurance policies received credit toward their steep quarterly sales quotas. Similarly, according to the *Broderick* complaint, the MyTerm policies were "sold predominantly to individuals with Hispanic-sounding last names concentrated in Southern California, southern Texas, southern Arizona and southern Florida." Those four states also accounted for the bulk of the sham accounts created by the Bank's employees as part of the "cross-selling" scheme described above.

110.    While Prudential began investigating the aforementioned sales of MyTerm policies through the Bank in 2015, and presumably was in contact with senior Bank management in connection therewith, Wells Fargo has made no public disclosure of the investigation or its consequences, which are likely to be material. Indeed, based upon the allegations in the *Broderick* complaint, the Bank is now in the "cross hairs" of insurance regulators in the states where MyTerm policies were sold illegally and subject to additional fines and other damages. At all times, the Individual Defendants concealed such misconduct and the negative impact thereof

Amended Complaint

upon Wells Fargo once this scandal was completely unwound.

**F.      The Revelation of the Auto Insurance Scandal in 2017**

111.    The CFPB has revealed that, for years, customers who financed auto purchases through Wells Fargo, have complained to federal regulators about insurance imposed unnecessarily and without authorization on their loans.   The Bank automatically imposed insurance coverage through its Dealer Services unit, even if the owner of the auto already had insurance.   The policies typically were expensive, costing more than $1,000 a year, and if a car was repossessed, Wells Fargo would charge a reinstatement fee of $500.

112.    More than ten years ago, Wells Fargo began contractually obligating customers to accept collateral protection insurance (or "CPI") policies if the customer either failed to obtain sufficient auto insurance, or allowed their auto insurance to lapse.

113.    The Company's practices and policies were succinctly summarized in the CFCB's findings included in its consent decree dated April 20, 2018 at the specified paragraph numbers:

        Force-Placed Automobile Insurance Practices

        27. Typically, when Respondent's borrowers obtained an auto-secured loan, the borrower signed an agreement that required the borrower to maintain insurance that would cover physical damage to the vehicle, which served as collateral for the loan. Respondent used a vendor to monitor borrowers' insurance coverage. If a borrower did not procure or maintain physical-damage insurance for the vehicle, Respondent could protect its interest in the collateral by acquiring Force-Placed Insurance on the borrower's behalf and charging the borrower for the insurance premium paid, in whole or in part, by Respondent to the insurer, plus interest.

        28. If Respondent's vendor was unable to verify that borrowers maintained the required insurance for their vehicles through policy information it obtained directly from insurance companies and from other data aggregators, the vendor was required to

communicate with the borrower multiple times before Force-Placed Insurance was acquired. Under Respondent's contract with its vendor, the vendor was required to send written notices to the borrower, as well as attempt to call the borrower and the borrower's previous insurance agent or insurance carrier to request evidence of insurance. If, following this outreach, the vendor was unable to obtain evidence of the required insurance, Respondent caused Force-Placed Insurance to be issued to the borrowers.

See https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf.

114. During the period of time relevant to this section, Wells Fargo's CPI vendors were NGHC and NGIC, and by Balboa and QBE.

115. There were perverse incentives in place that incentivized the overuse of forced placement insurance, both on the part of the vendor and on behalf of Wells Fargo. On the vendor's side, every forced place insurance policy brought with it an often overpriced premium and servicing fee to the insurance company vendor. Wells Fargo benefitted, at least initially, with each forced placed insurance policy issued by the kickbacks it received, euphemistically referred to as "commissions," from the issuing insurance companies.

116. These mutally enforcing perverse incentives to improperly issue force placed insurance policies had a predictable outcome.

117. After years of concealing the auto insurance fraud, Wells Fargo finally initiated, in July 2016, a review of the CPI program and related third-party vendor practices, and discontinued its CPI program in September 2016, although it failed to disclose its review and discontinuation publicly. Compounding the shocking nature of the misconduct, the Bank's failure to properly disclose to its customers the unlawful CPI policies and/or the resulting automatic deductions from customers' bank accounts often put them in a financial tailspin.

118. The Bank hired a consulting firm, Oliver Wyman, which "looked at insurance policies

sold to its customers from January 2012 through July 2016," and issued a report in February 2017. The Wyman Report concluded that the Bank owed $73 million to wronged customers, and that 100,000 policies violated the disclosure requirements of at least five states — Arkansas, Michigan, Mississippi, Tennessee, and Washington. The Report further concluded that the Bank's borrowers sustained various financial damages, including the costs of the insurance wrongfully billed to them, repossession costs, late fees, account delinquencies, overdrawn payment accounts, and damage to consumers' credit reports.

119.    On July 28, 2017, *The New York Times* published an article, entitled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers." The article summarized the scandal as follows:

> "More than 800,000 people who took out car loans from Wells Fargo were charged for auto insurance they did not need, and some of them are still paying for it, according to an internal report prepared for the bank's executives.   The expense of the unneeded insurance, which covered collision damage, pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle repossessions . . . . Among the Wells Fargo customers hurt by the practice were military service members on active duty."

120.    *The Times* article concluded that "Wells Fargo officials confirmed that the improper insurance practices took place and said the bank was determined to make customers whole."

121.    The article quoted Franklin R. Codel, the head of consumer lending at the Bank, as stating that "[w]e have a huge responsibility and fell short of our ideals for managing and providing oversight of the third-party vendor and our own operations."

122.    Jennifer A. Temple, a Wells Fargo spokeswoman, was also quoted and she conceded that the forced insurance placement may have contributed to 20,000 wrongful repossessions, that 60,000 customers did not receive complete disclosure before the insurance was force placed, that 570,000 customers were entitled to a refund, and that "[w]e take full responsibility for these

1  errors and are deeply sorry for any harm we caused customers."

2  123.   At 11 p.m. on July 27, 2017, after Wells Fargo became aware of the impending New

3  York Times expose, the Company rushed to issue a press release that belatedly addressed the

4  forced placement insurance fraud that it had so successfully concealed for years.   The press

5  release, entitled "Wells Fargo Announces Plan to Remediate Customers for Auto Insurance

6  Coverage" admitted that external vendor process and internal controls were inadequate, and that

7  approximately 490,000 customers were charged premiums for CPI even if they already owned

8  adequate vehicle insurance, that 60,000 customers did not receive specific notification and

9  disclosure requirements as required by their states, and that the additional costs of the CPI

10  contributed to a default for 20,000 customers resulting in repossession of their vehicles.

11  124.   The press release quoted Mr. Codel, who stated: "We take full responsibility for our

12  failure to appropriately manage the CPI program and are extremely sorry for any harm this

13  caused our customers, who expect and deserve better from us."   Mr. Codel promised that the

14  Bank        would        compensate        all        the        impacted        customers.

15  https://www.businesswire.com/news/home/20170727006737/en/Wells-Fargo-Announces-Plan-

16  Remediate-Customers-Auto.

17  125.   When news of the forced auto placement insurance scandal was belatedly disclosed,

18  defendant Codel essentially admitted that there was a "failure to appropriately manage the CPI

19  program" and a failure in its "huge responsibility" and "ideals for managing and providing

20  oversight of the third-party vendor and our own operations."

21  126.   The Company estimated that, for the years 2012 through 2017, it would be responsible

22  for as much as $80 million in estimated remediation costs.   The Company indicated that it

23  expected to mail remediation checks to some customers starting in August 2017.

24  127.   Senator Warren called for the resignation of the entire Wells Fargo Board in a statement

25  she issued, as follows:

42

"There are surely deep risk management problems at a bank when it opens  millions      of fake customer accounts and charges nearly a million customers for a financial product they don't need – all over roughly the same five-year period."

The Wells Fargo Board is ultimately responsible for that failure, and the Federal Reserve should remove Board members, who served during that time period."

128.    The Company also faces a federal class action lawsuit styled, *In re Wells Fargo Collateral Protection Insurance Litigation*, Case Number 8:17-ML-2797-AG-KES (C.D. Cal.), brought on behalf of consumers affected by the forced placed CPI insurance scandal.

129.    On October 3, 2017, a CNN Money report entitled "Wells Fargo accused of lying to Congress about auto insurance scandal," described a hearing that same day before the Senate Banking Committee, in which Senator Brown is reported as admonishing a Wells Fargo executive by stating "[t]he company pure and simple lied to this committee -- and lied to the public."  Although Wells Fargo has said it first became aware of the auto insurance debacle in July 2016, defendant Stumpf did not mention it to Congress during September 2016 Congressional hearings, even in direct response to questioning as to whether there was other existent fraudulent activity.

130.    Additionally, the Senate Banking Committee inquired as to whether Wells Fargo was "confident that this type of fraudulent activity does not exist elsewhere in the bank," and whether the Company "discovered other types of misconduct."  Wells Fargo responded: "We believe that the activity at issue here was limited to certain "employees in the Community Banking division. The Company failed to mention the auto insurance scandal.

131.    Defendant Sloan was asked by Senator Brown why he continued to cover up the auto insurance scandal.  He responded by attempting to distinguish the two scandals, which did not explain why Wells Fargo knowingly withheld information on the auto insurance scandal in response to direct questions by Congress on two occasions, and in SEC filings.

Amended Complaint

132.    On October 20, 2017, *The New York Times* reported on an OCC Report that reportedly criticized Wells Fargo for having underestimated the cost to remediate the forced placed insurance scandal. Gretchen Morgenson, Regulator Blasts Wells Fargo for Deceptive Auto Insurance Program, *New York Times* (Oct. 20, 2017).

133.    The Times reported that the OCC had found that Wells' Fargo's earlier claim that the remediation would cost $80 million was low because it was based on "an overly complicated reimbursement methodology, which lacked clear support for addressing all the customer costs incurred." The *Times* further reported that "[t]he report paints a damning picture of a bank that didn't monitor its contractors,that lacked the impetus to correct problems once they were uncovered and that proved unresponsive to complaints from its customers."

134.    Wells Fargo's Report on Form 10-Q for the period ended September 30, 2017, which was filed with the SEC on November 3, 2017, revealed that the Company's earlier statement that the scandal affected 570,000 consumers during 2012 through 2014, "the time period in which customers may be eligible to claim or otherwise receive remediation compensation for certain CPI placements has now been extended back to October 2005," and the estimated cost of remediation was raised to $130 million.

135.    The Board's stunning lack of oversight of the Company's business has continued, and wrongdoing at Wells Fargo is so pervasive that, in addition to other regulatory, financial and reputational exposure, loss, and damages specified in this Complaint, on April 20, 2018, the CFPB levied a fine of $1 billion upon Wells Fargo on account of the frauds directed to its auto insurance customers and for various mortgage lending abuses.    See https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf.

137.    The CFPB Order sets forth a detailed litany of the Company's breaches and derelictions relating to the Company's forced auto insurance, and home mortgage commitment violations,

and how such violations of the Consumer Financial Protection Act affected hundreds of thousands, if not millions, of the Bank's customers.

138.    Indeed, the CFPB Order recites as follows:

29. Since 2005, Respondent forcibly placed insurance for the vehicles of about 2 million borrowers who secured auto loans with the bank. According to Respondent's own analyses, it forcibly placed duplicative or unnecessary insurance on hundreds of thousands of those borrowers' vehicles. In addition, for some borrowers, after appropriately placing Force-Placed Insurance policies, Respondent improperly maintained Force-Placed Insurance policies on the borrowers' accounts after the borrowers had obtained adequate insurance on their vehicles and after adequate proof of insurance had been provided. If borrowers failed to pay the amounts Respondent charged them for the Force-Placed Insurance, they faced additional fees and, in some instances, experienced delinquency, loan default, and even repossession.

30. If the borrower provided evidence that insurance coverage had been in effect, Respondent had a process to cancel the Force-Placed Insurance and to refund premiums. But Respondent did not sufficiently monitor its vendor and internal processes, resulting in control and execution weaknesses, such as within the insurance-verification and cancellation processes and the protocols for processing refunds. Additionally, Respondent failed to provide data and information to its vendor that could have allowed its vendor to more effectively execute its obligations to Respondent and borrowers. Finally, Respondent did not maintain a process to evaluate whether fees should have been refunded and failed to appropriately address and assess customer complaints.

31. Through quarterly reports from its vendor and its own daily reports, Respondent was aware of high rates of Force-Placed Insurance cancellations, and Respondent received briefings on the root causes of the cancellations. The high rates of cancellation were also

45

apparent within Respondent's own system of record because it processed the refunds when a Force-Placed Insurance policy was canceled, and it reported that refund information back to the vendor.

32. The vendor regularly presented to Respondent's management on the Force-Placed Insurance program's performance. These presentations included cancellation rates of Force-Placed Insurance for borrowers who never had a lapse in required insurance coverage, known as "flat cancels," and borrowers who had the required insurance for part of the Force-Placed Insurance policy term, known as "partial cancels."

33. Respondent was informed by its vendor that, since 2005, roughly 28% of Respondent's Force-Placed Insurance policies were canceled because they were duplicative of insurance maintained by borrowers for the entire term of the Force-Placed Insurance policy. The number of cancellations should have raised concerns that Respondent's and its vendor's processes for determining insurance coverage before and after placement of Force-Placed Insurance were insufficient.

34. From 2011 to 2016, Respondent caused hundreds of thousands of consumers to be charged substantial premiums—typically just over $1,000 a policy—for unnecessary or duplicative Force-Placed Insurance. Although Respondent caused the premiums to be refunded after receiving proof of adequate insurance during the coverage period, the refunds covered all of the interest charged for only flat cancels. And, in many cases, Respondent did not refund other fees or related charges, such as repossession fees, late fees, deferral fees, and NSF fees.

35. From 2011 to 2016, Respondent acknowledges that for at least 27,000 customers, the additional costs of the Force-Placed Insurance could have contributed to a default that resulted in the repossession of their vehicle.

Unfair Acts and Practices Relating to Force-Placed Insurance, in Violation of the CFPA

36. An unfair act or practice is one that causes or is likely to cause substantial injury to consumers that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or competition. 12 U.S.C. § 5531(c).

37. Respondent's conduct caused or was likely to cause substantial injuries to consumers because it required them to pay for Force-Placed Insurance premiums and interest that they should not have owed, to incur fees, and, in some instances, to be subject to defaults on their auto loans and repossession of their vehicles.

38. These injuries were not reasonably avoidable by consumers and were not outweighed by countervailing benefits to consumers or to competition.

39. From July 21, 2011, through September 30, 2016, Respondent engaged in unfair acts or practices, in violation of §§ 1031(c) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

See https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank_na_consent-order_2018-04.pdf (at paragraphs 27-39).

139.    The forced place insurance scheme that is the subject of plaintiff's Supplemental Demand referred to herein was neither an isolated, limited or idiosyncratic event. To the contrary, it is one of a series of forced placed insurance scandals that demonstrate a stunning failure of oversight by the Board dating back years in which similar forced place insurance scams have cost the Bank hundreds of millions of dollars in damages.

140.    Wells Fargo and its partners have been implicated in numerous force placed insurance schemes in various settings dating as far back as 2006, when the Bank, along with QBE, reportedly agreed to pay up to $19 million to settle claims brought by a class of homeowners in Florida alleging that the Company and its partners improperly forced high priced homeowners' insurance and received kickbacks in connection therewith during the period from April of 2006 and February of 2013, described in a highly detailed Class Action Complaint dated August 5,

47

1    2011.  *See  Ray Williams, et al. v. Wells Fargo Bank, N.A.,* et al., Case No. 1:11-cv-21233-RNS
2    (S.D.Fla.)(Doc. No. 44, August 9, 2011). See also Id., Doc. No. 348.1 (Stipulation of Settlement
3    dated May 13, 2013); Doc. No. 354-2 (Settlement Notice dated August 21, 2013).

4    141.    In 2014, Wells Fargo and Assurant, Inc. reportedly agreed to pay up to $281 million to
5    settle a class action brought on behalf of over one million homeowners nationwide, which
6    alleged that, during the periods (depending on the state involved) ranging from 1998 through
7    2014, the improper placement of homeowners' insurance on homes on which the Bank held a
8    mortgage and received kickbacks in connection therewith. *See Ira Marc Fladell, et al., v. Wells*
9    *Fargo Bank, N.A., et al*., Case No. 0-13-60721 (S.D.Fla.) (Second Amended Class action
10   Complaint, Doc. No, 155-1, March 3, 2014). The states covered were consumers located in
11   California, Florida, Illinois, Indiana, Louisiana, New Jersey, New York, Ohio, Pennsylvania,
12   Texas, and "other states." See Id., Class Settlement Notice, Doc. No. 158-2, March 2004).
13   Because of the magnitude of these litigations and their settlements, the members of the Board
14   were undoubtedly knowledgeable with respect to the underlying illegal practices, in which they
15   acquiesced.

18   142.    In each case, as in the scandal that is the subject of plaintiff's Supplemental Demand,
19   there was a common pattern. The Bank partnered with one or more insurance companies, and
20   together, they engaged in a scheme that resulted in expensive insurance placed and charged to
21   unsuspecting customers, with the Bank being rewarded unjustifiably by being paid
22   "commissions" on such insurance by its insurance company "partner." It appeared to be a "win-
23   win" situation for the Bank, and for its insurance company partners, all at the expense of the
24   defrauded consumers, which resulted in substantial cost and legal exposure to the Company.

26   **G.     The Gap Refund Scandal Revealed in 2017**

27   143.    Under its Guaranteed Asset Protection ("GAP") service, the Bank agreed to cancel the
28   remaining auto loan balance when the customer's automobile is "totaled" (i.e., damaged beyond

Amended Complaint

repair or stolen and never recovered) and the insurance payout does not cover the outstanding balance on the loan.  If the underlying loan is paid off or otherwise terminated early, there is no longer any need for GAP protection because there is no longer any possibility of a "gap" between an insurance payout and the outstanding balance on the loan.  In such situations, the Bank was required under applicable law to refund to the affected customers the unearned portion of the GAP Fees on a pro rata basis.

144.    The Bank, under the direction of its senior management, systematically failed to refund unearned fees wrongly extracted from customers who financed their automobile purchases from Wells Fargo and purchased its GAP service, in violation of various state and federal laws.

145.    In its SEC Reports on Form 10-Q for the quarters ending June 30, 2017 and September 30, 2017, the Company stated publicly that the Company found "problems" related to the GAP refund fees, which may subject the Company to formal and informal inquiries and investigations, and subject the Company to litigation.

146.    The GAP protection refund scandal was the subject of a *New York Times* article on August 7, 2017 entitled, "Wells Fargo, Awash in Scandal, Faces Violations Over Car Insurance Refunds,"  which aptly observed that "[t]he new problem raises questions about Wells Fargo's internal controls and its board's oversight of company operations."  The article posited that "[b]ecause Wells Fargo is a large auto lender, tens of thousands of customers may have been affected by the bank's actions on GAP insurance."

147.    Asked about the regulatory inquiry into GAP insurance at Wells Fargo, Darren Gersh, a spokesman for the Federal Reserve in Washington said, "We are focused on ensuring that the root causes of a firm's compliance and controls breakdowns are understood and addressed." He declined to comment on the specifics, adding that "the Federal Reserve Board will take any regulatory and supervisory steps we feel are necessary to ensure the firm's attention to compliance."

Amended Complaint

**H.      Harsh Consent Decrees Issued in 2018**

148.     On January 12, 2018, in an article appearing in The Washington Post entitled "The Federal Reserve Cracks Down on Wells Fargo Over Scandal Involving Sham Accounts," it was reported that the Federal Reserve had levied "an unprecedented penalty against Wells Fargo…, blocking its ability to grow larger and pressuring the mega bank to replace four board members following widespread consumer abuses." The article described the "surprisingly harsh consent order" as "the latest fallout from Wells Fargo's admission more than a year ago that it had opened millions of sham accounts customers didn't want." It was reported that the Consent Decree, "which ha[d] been in the works for months," "marks the first time that the Federal Reserve has placed limits on a bank's assets."

149.     Indeed, on February 2, 2018, the Company's Board agreed to a Consent Decree with the FDIC which stated that "the Firm pursued a business strategy that emphasized sales and growth without ensuring that senior management had established and maintained an adequate risk management framework commensurate with the size and complexity of the Firm, which resulted in weak compliance practices."

150.     The Consent Decree further states that "the Federal Reserve Bank of San Francisco (the "Reserve Bank") and Board of Governors previously identified deficiencies in [Wells Fargo]'s risk management – including compliance risk management – that [Wells Fargo] has yet to correct fully."

151.     The Consent Decree recited the issuance of Consent Orders by the OCC and CFPB "designed to remedy deficiencies cited by the OCC and the CFPB in the Bank's management oversight of sales practices and risk management" and urged Wells Fargo to "continue to implement an effective firmwide risk management program that is commensurate with [Wells Fargo]'s size, complexity and risk profile to ensure that [Wells Fargo] operates in a safe and sound manner and complies with all applicable law and regulations . . . ."

Amended Complaint

https://www.federalreserve.gov/newsevents/pressreleases/files/enf20180202a1.pdf.

152.   In connection with this Order, the Federal Reserve addressed letters (dated February 2, 2018) to each member of the Wells Fargo Board, admonishing them: "As events of the past few years have confirmed, [the Wells Fargo] board's performance of this oversight role did not meet our supervisory expectations."

153.   The Federal Reserve specified that the September 2016 disclosure of the illicit account opening scheme and the firing of thousands of employees for improrer sales practices between 2011 and 2015, the unneeded CPI for automobiles scandal, the GAP scandal, and other compliance breakdowns "have caused substantial customer harm and have troubled the Board of Governors."

154.   The Federal Reserve demanded that the "board of directors must take further steps to ensure that senior management establishes and maintains an effective risk management structure that has sufficient stature, authority, and resources; is independent of business lines; and is commensurate with the firm's size, complexity, and risk profile.  The firm's lack of effective oversight and control of compliance and operational risks contributed in material ways to the substantial harm suffered by WFC's customers…."

155.   The Federal Reserve's extraordinary public statement, illustrates the depths to which Wells Fargo has sunk. As stated by former Chair Janet L. Yellen:

> "We cannot tolerate pervasive and persistent misconduct at any bank and the consumers harmed by Wells Fargo expect that robust and comprehensive reforms will be put in place to make certain that the abuses do not occur again… The enforcement action we are taking today will ensure that Wells Fargo will not expand until it is able to do so safely and with the protections needed to manage all of its risks and protect its customers."

> "In recent years, Wells Fargo pursued a business strategy that prioritized its overall growth without ensuring appropriate management of all key risks. The firm did not have

an effective firm-wide risk management framework in place that covered all key risks. This prevented the proper escalation of serious compliance breakdowns to the board of directors."

https://www.federalreserve.gov/newsevents/pressreleases/enforcement20180202a.htm.

156. Blame was placed squarely on flawed and in some instances non-existent oversight. https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-bank-na_consent-order_2018-04.pdf.

157. The $1 billion fine that was imposed by the CFPB included a credit in the amount of a $500 million fine that the OCC separately (and simultaneously) assessed against Wells Fargo. The $500 million civil money penalty reflects the Bank's failure to develop and implement an effective enterprise risk management program to detect and prevent the unsafe or unsound practices, and the scope and duration of the practices. The OCC also reserved the right to take additional supervisory action, including imposing business restrictions and making changes to executive officers or members of the Bank's Board of Directors. https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-41.html.

158. The OCC's action is reflected in a Consent Order for a Civil Money Penalty (https://www.occ.gov/static/enforcement-actions/ea2018-026.pdf),   and   a   Consent   Order (https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf),   which   included   blistering assessments of the massive oversight failures that led to the unprecedented enforcement action.

159. In announcing its enforcement action, the OCC stated:

"The OCC took these actions given the severity of the deficiencies and violations of law, the financial harm to consumers, and the bank's failure to correct the deficiencies and violations in a timely manner. The OCC found deficiencies in the bank's enterprise-wide compliance risk management program that constituted reckless, unsafe, or unsound practices and resulted in violations of the unfair practices prong of Section 5 of the

52

Federal Trade Commission (FTC) Act. In addition, the agency found the bank violated the FTC Act and engaged in unsafe and unsound practices relating to improper placement and maintenance of collateral protection insurance policies on auto loan accounts and improper fees associated with interest rate lock extensions. These practices resulted in consumer harm which the OCC has directed the bank to remediate."

## I.   FALSE STATEMENTS

160.   For many years, those of the Individual Defendants serving on the Company's Board of Directors at the time knew of the illicit account creation scheme and much of the other wrongdoing set forth above, and yet, they made false or misleading statements in SEC filings, proxy statements and public statements that they knew were false or misleading at the time they were made. These statements subjected Wells Fargo to, *inter alia*, class actions and other litigation by defrauded investors, subjecting the Company to hundreds of millions of dollars in liabilities and legal expenses.

161.   Most notably, the Individual Defendants wrongfully touted Wells Fargo's success at cross-selling, while failing to disclose the Company's illicit account creation scheme.  For example, the Wells Fargo 2013 Annual report states the Company's "cross-sell strategy" would "facilitate growth in both strong and weak economic cycles."  The Company's Report on Form 10-K for 2013, filed on February 26, 2014, states that the Company "ended the year as America's most profitable bank" and "achieved record cross-sell across the Company."  Likewise, the Company's Report on Form 10-K for 2014, filed on February 25, 2014, states that the "ability to grow primary customers is important…because these customers…have higher cross-sell and are more than twice as profitable as non-primary customers."  Such statements were and are false and misleading because the Individual Defendants improperly omitted that the Company's successful financial performance stemmed, in material part, from the illicit account creation scheme, of which the Individual Defendants were substantively aware, and did not

disclose.

162.    Besides the fact that the Individual Defendants caused the Company's public statements to emphasize the import of cross-selling metrics to Wells Fargo's financial performance, while failing to disclose the Company's illicit account creation scheme, they also reported what they knew to be were artificially inflated revenues and earnings as a result of this scheme.

163.    Given that the Individual Defendants knew or should have known that there were over 1.5 million unauthorized deposit accounts and over 565,000 unauthorized credit card accounts involved in the illicit scheme, the critical performance metric was knowingly inaccurate because it was based on a significant number of fraudulent accounts, which they failed to disclose.  Every Wells Fargo 10-Q filing in 2014 and 2015 and the first quarter 10-Q filing in 2016 presented artificially inflated metrics; the Company's CEO and Chief Financial Officer ("CFO") attested falsely that the information contained therein fairly presented the financial condition of the Company, despite their knowing that these filings presented materially false and misleading revenues and earnings.    Additionally, each member of the Board signed off on the Wells Fargo Form 10-K annual reports for 2013, 2014,  and 2015,  falsely attesting to the accuracy of the financial information despite knowing that the Company's revenues and earnings were inflated by material amounts.

164.    Additionally, the Individual Defendants made materially false statements about Wells Fargo's risk management processes and internal controls.  Every year, the Company's CEO and CFO have attested to the purported adequacy of Wells Fargo's internal controls and unjustifiably issued certifications pursuant to the Sarbanes-Oxley Act of 2002, under criminal penalty of perjury.  Defendants Sloan and Shrewsberry and members of the Board signed off on Wells Fargo's Reports on Form 10-K for 2013 through 2017, falsely stating that the financial statements and information fairly present the financial condition of the Company, and falsely attesting to proper internal controls over financial reporting despite multiple Consent Orders of

various regulatory agencies, specifically admonishing and fining the Company for lack of internal controls, deficient risk management, and ineffective oversight of sales practices.

165.    Particularly egregious was the Wells Fargo 2015 Annual Report, filed on February 24, 2016, which touted the Company's "adherence to regulatory guidelines" and claimed its compensation scheme discouraged employees from taking "inappropriate risk…that is not in the best interest of customers."  Likewise, the Company's 2016 Proxy Statement, promulgated by and in the name of the Wells Fargo Board, announced that its Human Resources and Incentive Compensation Committees did not find any risks associated with the Company's compensation policies and practices.   All of these statements were known to be false given the Individual Defendants' knowledge of the illicit account creation scheme as well as other material wrongdoing as described above.

166.    Furthermore, Wells Fargo's proxy statements for the years 2014 and 2015, which were issued by and in the name of the Board, tried to secure approval of substantial incentive compensation awards for defendant Tolstedt, then the Bank's Senior Executive Vice President of Community Banking, praising her leadership and record setting cross-sell ratios, despite the Individual Defendants' knowledge at the time that the illicit account creation scheme was most prevalent in her department and for which she was personally responsible.

167.    Wells Fargo's proxy statements for the years 2014, 2015, and 2016, which were issued by and in the name of the Board, omitted material facts, failing to mention, *inter alia*, the illicit account creation scheme, the seriously deficient internal controls that allowed the scheme to continue, or the compensation programs that encouraged fraudulent account openings.  Nor did they report the numerous pending investigations by various regulatory agencies that were underway.  Indeed, to the contrary, Wells Fargo's proxy statement for the year 2016 was completely misleading and deceptive in its description of the Company's purported "compensation risk management policies and practices" and "active oversight and monitoring"

55

Amended Complaint

that would "not encourage excessive risk taking."  In actuality, the Company's compensation system rewarded excessive and, indeed, reckless, risk-taking and illegal practices.

168.    Not only did the Individual Defendants fail to disclose the prevailing illicit account creation scheme, but they enabled a fraudulent policy whereby 24-hours notice was given prior to a so-called random audit of sales practices, allowing Bank managers and executives enough time to shred documents or mask evidence.  On February 1, 2017, the Senate Banking Committee members stated, "these latest allegations by Wells Fargo employees raise yet another red flag indicating that top management and the board of directors of Wells Fargo knew or should have known about the extensive fraud occurring throughout the bank."  The Senators further concluded that "Wells Fargo's internal review system was allowed to operate with serious flaws for years, remains flawed, and lacks appropriate controls to prevent future harm to the bank's customers."

169.    Wells Fargo's proxy statement for the year 2016, which was issued by and in the name of the Board, tried to secure the election of nominees to the Board for the following year.  In an effort to bolster the candidacy of these Board members and to secure their election to the Board, the 2016 Proxy Statement touted the purported credentials and accomplishments of the directors, emphasized their commitment to effective oversight and transparency, and highlighted the steps they had authorized and taken to discharge those obligations, despite knowing that the Company's corporate governance structure was designed to absolve the Board of any real accountability and that various regulatory agencies specifically criticized the Board for their lack of oversight of sales practices.

170.    Among the steps touted in the 2016 Proxy Statement in support of these objectives, and to induce shareholders to vote in favor of the director candidates, was to emphasize that the Board had commissioned an "independent" investigation into the cross-selling scandal.  This special Board Committee, was chaired by "Independent" Chairman, defendant Sanger, and

56

included three other purportedly independent directors (defendants Duke, Hernandez, and James). The "independent" directors retained S&S to "assist" in the investigation.

171.    These and representations of similar import which concealed the material wrongdoing permeating the senior management of Wells Fargo and the Bank as described above were materially false and misleading for at least the following reasons: the "investigations" that were referred to in the 2016 Proxy Statement were neither independent, *bona fide*, nor reasonably calculated to arrive at a complete, truthful and objective conclusions,  but were instead designed to and have the effect of marginalizing the Board members' breaches of fiduciary duty, exculpate such Board members from liability, and to induce their re-election to the Board, where they could continue to conceal the full effects of their wrongdoing and the harm caused to the Company and  continue to inflict even more harm.

172.    Additionally, in an effort to create the impression that the Company's ever-escalating problems were behind it, the 2016 Proxy Statement boasted that management was on its way to meaningfully address these issues and had been and were committed to full transparency. However, the Individual Defendants were not transparent about the problems at the Company and continued to conceal widespread wrongdoing such as the forced placed auto insurance scandal and other material wrongdoing referred to in this Complaint.  Indeed, the Individual Defendants did not even mention the auto insurance scandal in Wells Fargo's proxy statement for the year 2017, filed in March 2017, which was issued by and in the name of the Board, nor in the Company's 2016 10-K, which was incorporated by reference in its 2017 proxy statement. These omissions of material facts were particularly egregious given all of the public outcry, governmental investigations, and rebukes over the widespread and multiple scandals in which the Company was enmeshed.

173.    On October 12, 2016, after defendant Stumpf resigned from Wells Fargo, the Board split the positions of Chairman of the Board and CEO, placing defendant Sloan as the Company's

Amended Complaint

President and defendant Sanger as Board Chair.  The Board had resisted vehemently such a move since 2005.  Indeed, in falsely opposing a shareholder proposal set forth in the Wells Fargo 2014 proxy statement, which would have required an independent Chairman of the Board to replace defendant Stumpf in that role, the Board stated falsely that its then-existing structure "provides effective independent oversight of management and board accountability" and that its governance was "working effectively as evidenced by the company's strong financial performance." The Board thereafter appointed defendant Sanger to the Chairman's position despite the fact that, each member of the Board was aware that he, historically, as "lead independent director," had not devoted the time and personal interest to putting the interests of Wells Fargo and its shareholders before all others. Upon information and belief, defendant Sanger has not expended sufficient time and interest in fulfilling his responsibilities as a director of Wells Fargo.

174.    At all material times, the conduct of the members of the Wells Fargo Board as described above was so egregious as to amount to intentional wrongdoing and a breach of their individual duties of loyalty to the Company and its shareholders.

## VI.    PLAINTIFF'S PRE-SUIT DEMANDS UPON THE BOARD AND ITS WRONGFUL REJECTION OF SUCH DEMANDS

175.    The claims asserted in this Complaint are brought by plaintiff derivatively on behalf of Wells Fargo. Plaintiff and his undersigned counsel will fairly and adequately represent Wells Fargo's interests in connection with this action.

176.    Before asserting the claims asserted derivatively in this Complaint, plaintiff made Initial (Ex. A) and Supplemental (Ex. B) pre-suit written Demands on Wells Fargo's Board pursuant to

58

Rule 23.1, Fed. R. Civ. P.

177.   The Board's actions in responding to the Initial and Supplemental Demands proved to be wrongful, not in good faith and solely designed to insulate the Individual Defendants from liability to Wells Fargo. As set forth below, the investigations of the Demands and their subsequent rejection by S&S on behalf of the Board amounted to a sham. Such rejections were wrongful and aimed at protecting the Individual Defendants; the Board (and S&S) should be held accountable therefor.

178.   The Board entrusted the Initial and Supplemental Demands to what S&S had described were committees of "independent directors," namely, defendants Sanger, Duke, James and Hernandez (as to the Initial Demand, see Ex. C) and defendants James, Duke and Hernandez (as to the Supplemental Demand, see Ex. D).

179.   Each of these so-called "independent" directors is a defendant in the Consolidated Action, represented by S&S.  Each such person is alleged to have breached his or her fiduciary obligations to Wells Fargo in connection with the illicit creation account scandal, and other wrongdoing.

180.   The Board did not respond in good faith and in the Company's best interests in choosing S&S as counsel to "assist" in the analysis and investigation of the matters raised in plaintiff's Initial and Supplemental Demands.  As to both the Initial and Supplemental Demands, the Board designated S&S purportedly to "assist" the "independent directors," in connection with the Board's investigation and analysis, including whether claims should be asserted against the Individual Defendants on behalf of the Company seeking recovery of the losses it sustained and is continuing to sustain as a result of their derelictions of duty.

181.   Moreover, upon information and belief, to avoid making a legitimate record of its investigations, S&S took no testimony from witnesses under oath, ordered no transcripts or recordings of such testimony and otherwise conducted largely superficial interviews of members

of the Wells Fargo Board.

182.    At the same time it was acting in that purportedly independent capacity, S&S was acting as lead defense counsel for Wells Fargo Board members in the Consolidated Action.  In that regard, the firm was committed to a strategy of vigorously contesting allegations of, *inter alia*, corporate mismanagement, breaches of fiduciary duty, and the issuance of materially false and misleading statements to shareholders and the investment community at large regarding certain issues raised by the Initial and Supplemental Demands.

183.    In addition to avoiding making a real record of what transpired during the investigations, in both fact and appearance, S&S's conflicting roles and loyalties raise questions about every material aspect of any purported "investigation" of plaintiff's Demands including: (a) who to interview? (b) what documents to review?  (c) what questions to ask? (d) how to balance S&S's possession of privileged information obtained during the course of its representation of these Board members with an obligation to critically and skeptically investigate the facts and articulate the bases for the results of the investigation? (f) who to blame for the various debacles described herein? (g) what actions the Company should take to seek monetary relief from any Board members who are culpable? (h) whether notes or transcripts of witness interviews would be kept? (i) whose documents should be reviewed? and (j) who is paying for the defense of the Board members in the various derivative and shareholder cases?

184.    The Board wrongfully rejected plaintiff's Demands in collusion with S&S, counsel for the members of the Board. See Ex. C, D.

185.    The Board's Initial Rejection Letter of June 30, 2017 only backhandedly alluded to plaintiff's demand that the Board spin off or otherwise dispose of Company business lines and/or effectuate other simplifications to structures of both Wells Fargo and the Bank (the "Structural Demands") by dismissively and conclusively stating, with no analysis or stated reasons, that:

"[t]he Board further concluded that the other proposed actions set forth in the Demand

60

1   have already been implemented or are not in the Company's best interests. Accordingly,

2   the Board has determined that the Demand should be rejected in its entirety."

3   See Initial Rejection Letter, Ex. C, at p. 1.

4   186.   The Board also caused to be posted on the Company's internet website a report, believed

5   to have been authored by S&S, a multi-page document dated April 10, 2017, entitled

6   "Independent Directors of the Board of Wells Fargo & Company Sales Practice Investigative

7   Report" (the "Report") (https://www08.wellsfargomedia.com/assets/pdf/about/investor-

8   relations/presentations/2017/board-report.pdf) that also purports to justify the Board's decision to

9   reject the demands set forth in plaintiff's Initial Demand Letter. Nowhere in the Report, prepared

10  by S&S, counsel for the purportedly "Independent Directors of the Board," did the Committee

11  address plaintiff's Structural Demands, as set forth in the Initial Demand.

12  

13  187.   The Report of April 2017 essentially puts nearly all of the fault for the matters contained

14  therein on certain senior officers of the Company and has as its tone that while the Board

15  members might have been more diligent, their only fault – to the extent they could be faulted at

16  all -- is that they relied too much upon certain senior officers who were the real cause of the

17  problems, thus ignoring the direct information each member of the Board had with respect to the

18  account-opening scandal and other material wrongdoing as discussed below.  While offending

19  officers were docked (i.e. clawed back) substantial bonuses and salary, there appears to have

20  been no financial consequence for the directors. Moreover, there is no evidence that the clawed

21  back amounts were ever, in fact, repaid to the Company and/or the Bank.

22  

23  188.   Such conclusion is particularly suspect since S&S does not represent any of the executive

24  officers in any other litigation, but does represent the members of the Board of Directors. The

25  investigations, for which S&S was paid millions of dollars, was shallow in its execution. Clearly,

26  S&S was invested in the results of the investigation, which makes the firm conflicted from being

27  able to conduct the investigations in the first place, a fact known by each member of the Board.

28  

61

The fact that an earnest attempt to investigate Plaintiff's Demands would be antithetical to S&S's clients, as it would have had to hold its own clients accountable for their wrongdoings, calls into question whether the investigations and decision-making processes were undertaken in good faith.

189.    Given that S&S did not merely "assist" in evaluating plaintiff's Demands, but it conducted whatever investigations were carried out to support the Board's eventual rejection of the Initial and Supplemental Demands, S&S's role in defending and advocating for these Board members in the lawsuits against them is utterly inconsistent with an independent, objective and bona fide investigation of the role and responsibility of these very Board members for the scandals and resulting harm to the Company.

190.    Additionally, the Reports' conscious disregard of known facts and clear evidence of the Board members' direct participation in facilitating the illicit account creation scandal and other material wrongdoing as alleged in plaintiff's Demands, calls into question the reasonableness and good faith nature of the Board's investigation of the claims made therein.

191.    In this regard, the Report addressing the Initial Demand ignores the fact that various members of Congress have raised concerns about the Board's responses to known illegal activity.  For example, Senator Brown questioned defendant Stumpf as to why no action was taken in response to the 2011 terminations of 1,000 employees in the Bank's retail sector for improper sales practices: "But it just doesn't seem quite right that – that it didn't occur to anyone on the board apparently…that they should do something more affirmatively."   Likewise, Senators Warren and Menendez on October 20, 2016 questioned why the Board was not being held accountable.

192.    Furthermore, the Report ignores that between 2012 and 2016, the OCC repeatedly admonished the Board for failing to address the Company's systematic deficiencies in risk management and oversight of sales practices, and for concealing the illicit account creation

Amended Complaint

scheme and its effects on Wells Fargo's financial results. Specifically, the OCC's June 2015 Supervisory Letter required corrective action in the oversight of sales practices and internal controls of cross-selling, particularly admonishing the failure to conduct successful audits and internal investigations to discover wrongdoings.

193.   The Report ignores the fact that the Audit Committee (defendants Baker, Dean, Hernandez, Milligan, Pena, Quigley, Swenson, Vautrinot) had failed to monitor and oversee the Bank's 24-hour advance notice rule, which allowed the branches to hide the illicit account creation scheme.

194.   Additionally, the Report disregards the Audit Committee's failure to act in response to the OCC's February 2013 supervisory letter regarding serious deficiencies in the Bank's operational risk compliance program, or to the OCC's April 2015 supervisory letter requiring the Bank to address the governance of its sales practices, or to the OCC's July 2015 Notice of Deficiency.

195.   Nor does the Report address the fact that it is the Audit Committee, which is responsible for approving the Company's SEC filings, and their failure to oversee the integrity of the Bank's financial statements and the adequacy and reliability of disclosures to its shareholders, caused the Company to issue false and misleading information regarding cross-selling metrics.

196.   The Report ignores the fact that the Board's Governance and Nominating Committee (defendants Dean, Milligan, Pena, Sanger, and Swenson) failed to uphold their obligation to address the corporate governance weakness demonstrated by the annual shareholder proposal to appoint an independent chairman.

197.   The Report did not discuss the failure of the Risk Committee (defendants Dean, Duke, Hernandez, Milligan, Pena, Quigley, Runstadt, and Sanger) and Corporate Responsibility Committee (defendants Baker, Chao, Dean, Hernandez, Milligan, Pena, and Rumstadt) to ensure an effective risk management framework, which would not allow highly aggressive sales

63

practices that create conditions for unlawful activity.

198.    The Report ignored the failure of the Human Resources Committee (defendants Chen, Dean, Engel, James and Sanger) to ensure the Company's incentive compensation practices did not encourage excessive risk-taking.

199.    Many of the same shortcomings tainted the manner in which the Board and S&S addressed plaintiff's Supplemental Demands.

200.    The Supplemental Demands were rejected by the Board on March 12, 2018 (Ex. D).  The letter does not address Senator Warren's statement that the entire Board should resign, or the FRB's February 2, 2018 directive to replace four directors, or the potential criminal liability of Wells Fargo for lying to Congress by intentionally withholding information with respect to the auto insurance scandal, and the general failure to disclose the scheme in SEC filings and proxy stateents.  In the face of such clear evidence of wrongdoing, the Board's conscious disregard of these known facts calls into question the reasonableness and good faith nature of the investigation into Plaintiff's Supplemental Demand.

201.    Additionally, the letter rejecting the Supplemental Demand indicates that S&S served in a principal role in the rejection.  Clearly, S&S was conflicted, in both appearance and fact, and unable to conduct a full and fair investigation into Plaintiff's Supplemental Demand, while maintaining its role and responsibility in representing, defending and advocating the absence of culpability for Wells Fargo's Board members that it was representing in connection with the Consolidated Action and otherwise.

202.    Remarkably, personal or officers and directors' liability insurance is not mentioned at all in the rejection letters for the Initial and Supplemental Demands, see Ex. C, D. There is, however, a very curious reference in the March 12, 2018 rejection letter (Ex. D. at p. 4) that states as one item that might be prejudiced if the Company were to sue officers is "[p]otential claims by employees against the Company, or by the Company against the insurance

64

underwriter."  Such position, as asserted in the Board's letters responding to plaintiff's Demands, conveniently taken under the pretext of acting in the interests of Wells Fargo, was yet another transparent effort to protect the personal interests of S&S clients, the Board members (i.e. their insurance coverage).  This position was and is in derogation of the interests of the Company, and was used by the Board and S&S to justify the Board's continuing its derelictions of duty as alleged in this Complaint.

203.   In reaching the determination not to initiate  the litigation demanded by plaintiff in his Initial and Supplemental Demands, the Committee and the Board stated, *inter alia*, that they "considered the potential negative consequences that instituting and pursuing litigation would have on the Company's position with respect to civil litigation brought by third parties (including federal securities and other litigation), as well as criminal and regulatory investigations and/or enforcement proceedings by various federal and state authorities and agencies," and "that filing such litigation could prejudice the Company's position in these ongoing investigations and litigation, as well as in potential future litigation. See Exs. C and D.

204.   Nowhere is S&S's conflict more manifest than in the excuse given that litigation against potentially culpable defendants not be pursued because of the affect that any such litigation might have on any other lawsuits the Company (i.e. S&S) is defending.  In other words, valid claims against the Board members represented by S&S will not be pursued, no matter how valuable to Wells Fargo, because no one wants to negatively impact upon the defense of these Board members in those actions in which they are being sued.

205.   The Committee(s) and the Board claimed that their members weighed the potential negative consequences against the likelihood of obtaining a meaningful recovery if the Board caused the Company to institute the litigation called for in the Initial and Supplemental Demands and "the [claimed] remedial measures that have already been taken by the Board and the Company with respect to the [claims specified in plaintiff's] Demands, as well as substantial

65

other measures to enhance governance, controls, and risk management at the Company." However, the Board's response did no such thing.

206.    The Board's rejection of plaintiff's pre-suit Demands gave no indication that the Board had yet taken any steps to preserve any and all claims Wells Fargo has against the Individual Defendants (or any of them) or third persons arising from the misconduct complained of herein, nor had they taken any steps to preserve any claims or rights the Company did have against the passage of time (e.g., by obtaining "tolling" or other similar agreements from potentially culpable persons) and, thereby, preserving valuable claims for the Company's benefit.

207.    Nor was there any indication that the Board either had investigated, or would investigate, whether viable claims were allowed to lapse in whole or in part, and if so, whether the Board intended to hold those responsible for such lapses for the loss of any such claims, and the waste of Wells Fargo's assets.

208.    With respect to the Company's claims against the Individual Defendants, plaintiff alleges, on the basis of information and belief, that Wells Fargo has maintained and paid for substantial directors' and officers' liability insurance. The Board's response does not either recognize nor foreclose the likelihood that such claims are traditionally covered by such insurance if they are brought derivatively on behalf of the Company by an outside shareholder such as plaintiff. In view of the Board's failure to produce contrary information, the fair and reasonable inference is that substantial insurance coverage exists under such circumstances, and that the Board is breaching its fiduciary obligation if it challenges plaintiff's standing to assert these claims.

209.    The Board's conclusion contained a flawed and half-hearted assessment of the potential viability of these claims in at least the following respects: (a) in emphasizing the purportedly "exculpated" claims (i.e., claims as to which Wells Fargo has sought to exculpate its directors absent a showing of intentional misconduct or gross negligence  against the director defendants),

66

the Committee failed to include any discussion of the fact that the claims alleged by plaintiff in his Demands are, in fact, claims that the members of the Board intentionally engaged in serious misconduct and/or were grossly negligent in the performance of their stewardship responsibilities which conduct is non-exculpable under Delaware law; (b) the severity of the misconduct at issue that surpasses the threshold for director liability even with respect to arguably exculpated claims; and (c) the exculpatory provisions do not apply to claims against the officer defendants.

210. This excuse is simply more disingenuous deflection that one would expect from a half-hearted, self-serving and heavily conflicted investigation designed to whitewash rather than to illuminate.

211. The breaches and other derelictions complained of in plaintiff's Demands are real, substantial and pervasive. Only those who have conducted a half-hearted and conflicted investigation would conclude that a case of intentional misconduct or gross negligence could not be made out on these facts to any Board member who is covered by the arguably exculpatory provisions.

212. The facts and circumstances set forth above resulted in the failure of the Board, the Committee(s) and their counsel, S&S, to conduct disinterested and objective investigations that would demonstrate the culpability of present and former Board members, senior executives and potentially culpable third parties involved in the conduct alleged herein.

213. These facts and circumstances raise at a minimum considerable reasonable doubt as to whether the Board has responded to plaintiff's Demands properly and in good faith, speak to the absence of the good faith investigation that the Board and Committee claim to have initiated in response to plaintiff's Demands, and raise a substantial question as to whether the Board has eschewed an independent and objective process, a good faith evaluation of the circumstances, and the steps that should be taken on Wells Fargo's behalf and in its best interests as a result

67

thereof.

214.    The Board's wrongful rejection of plaintiff's Demands, as described above, confers standing on plaintiff to assert the claims alleged in this Complaint and to pursue damages and other relief on behalf of Wells Fargo.

215.    Certain of the claims included in the Initial Demand and in this Complaint, specifically the unauthorized account opening scandal and certain pre-2017 proxy fraud claims, are also included in the Complaint  that was the subject of the Court's ruling in  *Shaev v. Baker*, Case No. 16-CV-5541-JST (N.D. Cal. May 4, 2017)(ECF No. 129). The claims relating to plaintiff's demand that the Board spin off or otherwise dispose of Company business lines and/or effectuate other simplifications to structures of both Wells Fargo and the Bank are not included in the Complaint in the Shaev case, nor are plaintiff's claims set forth in the Supplemental Demand relating to the forced placement of automotive insurance.

216.    Unlike the plaintiff in this case, the plaintiff in the *Shaev* Complaint did not make a pre-suit demand before instituting suit. The plaintiffs instead relied upon their assertion that pre-suit demand was futile because the Wells Fargo Board faced a substantial prospect of personal liability with respect to these matters. The Court accepted their argument and denied the defendants' motion to dismiss on this ground in its Order dated May 4, 2017, and that litigation is proceeding in accordance with the Scheduling Order entered by the Court in that case.

217.    This case can proceed in tandem with the Consolidated Action although formal consolidation with it is inappropriate under the circumstances given the differences in substantive claims and legal issues (e.g. the impact of the rejection of plaintiff's pre-suit demands). All other aspects of the additional matters covered by plaintiff's demands should be permitted to proceed in the ordinary course.

218.    Moreover, as set forth above, the Board's responses to plaintiff's Demands considered individually and collectively, including the ultimate rejection of the Demands, represents a

68

disrespectful consideration of plaintiff's compliance with the demand requirements of Rule 23.1.

COUNT I

(Breach of Fiduciary Duty And Waste of Corporate Assets)

219.    Plaintiff repeats and re-alleges each of the allegations in this Complaint above as if fully set forth herein.

220.    This Count asserts claims against the Individual Defendants on account of the damages sustained and being sustained by the Company as a result of the material wrongdoing described herein and as set forth in plaintiff's Initial and Supplemental Demands.

221.    By reason of their positions as directors and/or officers of Wells Fargo and because of their ability to control Wells Fargo's business activities during the times they served as officers and/or directors, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to supervise and control the Company in good faith and in diligent and honest fashion.

222.    This Count is based upon the Individual Defendants' breaches of their fiduciary duties to oversee and manage the affairs of Wells Fargo with due care and in a diligent, informed, candid, ethical, legal and orderly fashion so as to avoid reputational, financial and other damage to Wells Fargo that has resulted from their failure to discharge these obligations as well as their failure to put the Company's interests before their own.

223.    In connection with the acts and omissions alleged in this Complaint relating to the issues raised in the Initial and Supplemental Demands, the Individual Defendants acted to retain their positions as officers and directors of the Company and, in particular, to continue to receive substantial unjustified compensation and other benefits.

224.    The Individual Defendants owed to the Company and its shareholders the fiduciary duty to exercise good faith, prudence and diligence in the administration and supervision of the affairs of the Company and in the use and preservation of its property and assets, and to exercise

Amended Complaint

reasonable and prudent supervision over the management, policies, practices, and controls of the Company and to ensure that the Company operated in a legal manner.

225.    The Individual Defendants all owed and/or owe fiduciary duties to Wells Fargo and its shareholders including the duty to exercise candor, good faith, loyalty and due care in the management and oversight of the Company's affairs.  By reason of their fiduciary relationships to Wells Fargo, the Individual Defendants specifically owed and owe the Company and its shareholders the highest obligation of good faith and loyalty in the management and stewardship of the affairs of the Company.

226.    In acting as they did to protect their positions as officers and/or directors (and the substantial financial and other benefits flowing therefrom) notwithstanding the serious wrongdoing each of them committed, or countenanced, each such Individual Defendant breached his or her duty of loyalty to the Company as well as, more broadly, breached the fiduciary duties owed to it.

227.    The Individual Defendants consciously and in bad faith violated their corporate responsibilities and breached their fiduciary duties to protect the rights and interests of Wells Fargo. In doing so, they acted intentionally against Wells Fargo's best interests. They did so by, inter alia, failing to address and covering up the fundamental fact that Wells Fargo had become functionally unmanageable, which resulted in, inter alia, known compliance failures and by failing to timely or at all address adverse events of which they were specifically aware or recklessly disregarded, and failing to take the necessary corrective action, including failing to implement policies, procedures, and controls ensuring management's compliance with applicable laws, rules and regulations, and by failing to take necessary action, when informed of management's willful non-compliance, as alleged in this Complaint.

228.    The Individual Defendants breached their fiduciary duties including, in particular, their duty of candor, by providing materially false and misleading statements in the Company's SEC

filings, public statements, and in proxy statements issued by and on behalf of the Board to Wells Fargo's shareholders relating to the purported stringency of their oversight and compliance plans generally.

229.    The Board and members of the Committee(s) represented by S&S compounded the foregoing wrongdoing by proceeding with woefully lacking, superficial and conflicted investigations of plaintiff's Demands, for which the Company received no benefit. In connection therewith, the Board and its counsel, S&S, wrongfully wasted the Company's assets in an amount which is not presently known to plaintiff.

231.    As a result of the misconduct alleged herein, Wells Fargo has sustained and will continue to sustain significant damages, not only monetarily, but also to its corporate image and goodwill.

232.    As a result of the misconduct alleged herein, the Individual Defendants are personally liable to the Company in an amount which cannot presently be determined.

## COUNT II

### (Breach of the Duty of Loyalty)

233.    Plaintiff repeats and re-alleges each of the allegations in this Complaint as if fully set forth herein.

234.    Each of the Individual Defendants were paid, directly and indirectly, substantial compensation (in the form of salary, stock and stock options) and, as well, received other benefits in order to retain the perquisites and emoluments of office. In order to retain such benefits, they put their own personal interests before those of the Company and its shareholders and concealed from them the wrongdoing alleged herein.

235.    They so acted against Wells Fargo's interests in order to be re-elected as directors and/or reappointed by the Board to their positions as senior officers, and attempted to insulate themselves from personal accountability for the consequences of their breaches of duty and other wrongdoing.

71

236.    As a direct and proximate result of the Individual Defendants' knowing and/or reckless breach of their duties of loyalty to Wells Fargo and its shareholders, including their failure to fulfill their fiduciary obligations as set forth in the Initial and Supplemental Demands, they have caused the Company to waste valuable corporate assets and expend its corporate funds unnecessarily by forming the Committee(s) and setting in motion investigations through S&S that were not conducted independently at the outset and utterly ineffective in getting at the facts surrounding the very serious compliance defaults as set forth in plaintiff's Demands, assigning appropriate blame for those derelictions, and holding responsible persons accountable for these massive failings.

237.    The entire investigatory process (which, on information and belief, resulted in the expenditure of millions of dollars of Wells Fargo funds) related to plaintiff's Demands was designed and carried out disloyally by the Board and Committee members so as to shield those responsible (including themselves and the other Individual Defendants) from accountability, rather than to objectively assess all relevant facts. As such, the investigations provided absolutely no benefit to Wells Fargo, and had the effect of exalting the personal interests of the Individual Defendants and other responsible parties over those of the Company.

238.    By acting wrongfully as they did, the Individual Defendants breached their respective duties of loyalty to Wells Fargo and, as such, should be held accountable to it for the wrongful conduct described herein.

239.    As a result of the illegal business practices detailed herein, the Individual Defendants have caused Wells Fargo to incur substantial damages, both reputational and financial. The reputational costs have been immeasurable. The financial costs far exceed $1 billion.

240.    The Individual Board Member Defendants have also wasted and potentially squandered valuable corporate assets by improperly failing and refusing to assert (and potentially to preserve) valuable claims against the Company's officers, directors, and third parties on account

72

of the losses sustained by the Company by virtue of the matters alleged in this Complaint.

241.      In a similar vein, the Individual Board Member Defendants have wasted corporate assets by authorizing a conflicted, flawed and ineffectual investigation of plaintiff's Demands that had no utility or purpose other than to attempt to insulate members of the Company's Board of Directors – including themselves – from liability for the harm they caused the Company.

## COUNT III

### (Breach of the Duty of Candor Derived

### from the Individual Defendants' Duties of Due Care and Loyalty)

242.      Plaintiff repeats and re-alleges each of the allegations in this Complaint as if fully set forth herein.

243.      This Count is asserted against all Individul Defendants who are or were members of the Wells Fargo Board of Directors at the time of the issuance of the 2017 proxy statement and is based upon their breaches of their duty of candor, which is derived from their duties of care and loyalty referred to above.

244.      Corporate officers and directors have a fiduciary duty to disclose fully and fairly all material information within their control in a straightforward and non-misleading manner that bear upon the decisions of the shareholders that are being solicited when the Board seeks shareholder approval for corporate action.

245.      This duty attaches to proxy statements and any other disclosures in contemplation of shareholder action, such as the re-election of directors and the ratification of the Board's selection of the Company's independent auditor.

246.      In or about January 2017, the members of Wells Fargo's Board caused the issuance of a Notice of Annual Meeting and Proxy Statement in anticipation of the Company's 2017 annual meeting of shareholders.

247.      The 2017 proxy statement issued by and in the name of the Board provided a purported

overview of the Company's business and operations. The 2017 proxy statement also solicited shareholder votes in accordance with Wells Fargo's corporate bylaws concerning a number of important corporate governance matters and policy initiatives, including the election and retention of the members of the Company's Board and independent auditor.

248.    The 2017 proxy statements touted the purported role, function and operation of the Board's Code of Ethics, its Corporate Governance Principles, and Audit Committee Charter.

249.    The 2017 proxy statement also incorporated by reference Wells Fargo's Annual Report on SEC Form 10-K for the most recent fiscal year, which ended on September 30, 2016. Such Form 10-K Annual Report included the Sarbanes-Oxley certifications by Wells Fargo's CEO and CFO.

250.    One of the principal purposes of these representations was to assure and convince the Company's shareholders that the nominated Board members were effectively fulfilling their fiduciary duties and obligations of due care and oversight over the Company's enterprise risks, its compliance with applicable laws, the adequacy and effectiveness of the Company's internal controls and procedures.

251.    Given the considerable degree of personal oversight and involvement the Board has claimed to exercise with respect to the Company's operations, as the 2017 proxy statement made clear, the actual qualifications, integrity and job performance of the individual Board members is highly relevant to a candid assessment of their job performance, and highly material to the question of whether they should be allowed to continue as stewards of the Company.

252.    It was, therefore, critical that, in order for Wells Fargo's shareholders to be in a position to make meaningful decisions and cast meaningful and informed votes concerning the reappointment (or rejection, as the case may be) of Board members annually, that all relevant and material facts be included by the Board within the four corners of the proxy statements in a full, candid and materially complete manner in the context of the representations affirmatively

74

made therein and be otherwise compliant with applicable federal securities laws.

253.    By reason of the representations and omissions in the 2017 proxy statement, the Board's nominees for directorships were elected and did more harm to the Company, as did approval of the compensation packages of several members of the Company's senior management.

254.    Notwithstanding the critical importance of disclosing all facts material to the election of the Company's directors, which is of the utmost importance to an effective and honest corporate suffrage process, the 2017 proxy statement issued by and in the name of the Board materially obscured the full extent of its members' acquiescence in the implementation and continuation of the violations of law alleged by the SEC and in plaintiff's Initial Demands. As significantly, the Board members failed to disclose the extent to which they were failing in their stewardship responsibilities because Wells Fargo had become increasingly unmanageable with no effective enterprise risk controls in place.

255.    It is a fair summary of these provisions of the 2017 proxy statement to say that it depicts and acknowledges that the Company's Board, including those among the Individual Defendants, are and were fully engaged in, and familiar with, the operations and policies of the Company through the manner in which the Board, its Committees, and reporting lines are structured.

256.    The 2017 proxy statement misrepresented and omitted material facts concerning the existence and efficacy of Wells Fargo's internal controls, and the existence of grave and systemic violations of internal control and other legal requirements.

257.    Adequate disclosure of these facts would have enabled Wells Fargo shareholders to make their own determinations and draw their own conclusions as to whether members of the Board should be retained notwithstanding these very serious set of highly material circumstances.

258.    The foregoing facts would be highly relevant and material to a reasonable shareholder exercising his or her right to vote to re-elect one or more or, indeed, all, members of the Board.

259.    Through the 2017 proxy statement, Wells Fargo's Board members represented that they –

and by extension their predecessor Directors - closely monitored and were aware of and familiar with the Company's operations and were, therefore, well-positioned to ensure that they discharged their obligations to ensure that Wells Fargo has in place appropriate management and internal controls to enable the Company to be and remain compliant with its legal obligations.

260.    In urging Wells Fargo shareholders to re-elect them under false pretenses, the members of the Board put their own personal interests before those of the Company and its shareholders, thereby breaching their duties of candor, loyalty and care.

261.    The re-election as directors generated substantial compensation and prestige. Such conduct and other serious wrongdoing on their part as described herein, amounted to a breach of their respective duties of loyalty and candor, particularly since they sought to and did obtain what they sought, the financial and other benefits of re-election, which re-election was not the Company's best interests.

262.    As a direct and proximate result of the foregoing, the Board member defendants were permitted to remain in their positions, substantially unchecked, because their misrepresentations and omissions concerning the extent and effectiveness of the Board's oversight had sufficiently misled the Company's shareholders into approving their re-election.

263.    As such, at least some of the Company's pervasive and extensive violations of the law as summarized in this Complaint were permitted to continue unabated resulting in substantial exposure and damage to the Company.

## COUNT IV

264.    Plaintiff repeats and re-alleges each of the allegations in this Complaint as if fully set forth herein.

265.    This Count is asserted against defendant National General Holdings Corp. and defendant National General Insurance Company.

266.    This Count is asserted against defendants National General Holdings Corp. and National

Amended Complaint

and General Insurance Company, and is based upon their culpable actions and omissions in aiding and abetting the Individual Defendants' breaches of their fiduciary duties to Wells Fargo.

267.    As Wells Fargo's close and longtime business partners, defendants National General Holdings Corp. and National and General Insurance Company were aware that Wells Fargo's officers and directors owed the Company fiduciary duties, which they breached by virtue of the conduct alleged in this Complaint.

268.    Because of its central role in deciding when and under what circumstances to force place CPI insurance, the assistance of National General Holdings Corp. and National and General Insurance Company in aiding and abetting the Individual Defendants' breaches of their fiduciary duties was both invaluable and essential. The Individual Defendants could not have carried out their breaches of their fiduciary obligations without the active, ongoing and knowing assistance of such compliant business partners that were at least as incentivized (if not more so) as the Individual Defendants were in engaging in a widespread and wrongful course of conduct in improperly placing massive numbers of forced placed insurance upon many hundreds of thousands of Wells Fargo customers who had their own auto insurance in place over a sustained period of time believed to exceed ten years (reportedly from 2006 through 2017).  National General Holdings Corp. and National and General Insurance Company also participated in similar schemes with respect to the forced placement of other types of insurance prior to and during the period of time that auto insurance was being forced place, resulting in hundreds of millions of dollars in losses to Wells Fargo, as alleged in this Complaint.

269.    Officials, employees and other representatives of National General Holdings Corp. and National and General Insurance Company who were centrally involved in the development and implementation of the scheme to wrongfully placed force CPI insurance as alleged in this Complaint, were aware of facts and circumstances that the placement of such insurance was improper yet they continued to engage in such conduct over a sustained period of time and

profited handsomely as a result, and they shared a portion of their the ill gotten gains derived from the forced placement insurance scheme with Wells Fargo in order to ensure a compliant partner in their scheme.

270.    National General Holdings Corp. and National and General Insurance Company thus acted intentionally and with conscious disregard of the rights and interests of Wells Fargo and its shareholders, and knew or recklessly disregarded that it was lending substantial assistance to, and aiding and abetting, the Individual Defendants' breaches of their fiduciary duties to Wells Fargo.

271.    National General Holdings Corp. and National and General Insurance Company did so in order to derive millions of dollars in income by issuing forced placement insurance under circumstances where

272.    National General Holdings Corp. and National and General Insurance Company were in a position to and did, in fact, provide substantial, indeed critical assistance to the other defendants' breaches of their fiduciary obligations and violation.

273.    As a direct and proximate result of the wrongful course of conduct alleged in this Complaint, including the improper and unlawful conduct of National General Holdings Corp. and National and General Insurance Company in aiding and abetting the individual defendants' breaches of their fiduciary obligations, Wells Fargo has already suffered, and continues to suffer, substantial harm.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff, derivatively on behalf of Wells Fargo, respectfully requests judgment against the Individual Defendants as follows:

Amended Complaint

(a)      An Order requiring the Board to undertake a thorough evaluation of Wells Fargo's corporate structure and operations in the context of the Board's ability to effectively fulfill its stewardship responsibilities, such evaluation to be carried out by one or more independent management consulting firms;

(b)      An Order requiring the Board to take appropriate steps leading to the orderly restructuring of the Company, including the divestiture of those lines of business, operations and subsidiaries as recommended pursuant to the foregoing evaluation;

(c)      An Order appointing a Special Master to oversee the Board's retention of appropriate experts and its carrying out and implementing the directives as set forth in the two preceding paragraphs;

(d)      An Order requiring the Board to nominate independent candidates for directorships so that a majority of the Board, post-election, consists of persons who were not directors during the period of the wrongdoing alleged herein.

(e)      An Order adjudicating and declaring the Individual Defendants responsible and liable for breaching their fiduciary duties to Wells Fargo, including the duty of loyalty, the duty of care, and wasting the Company's assets and that they acted in bad faith in connection therewith, and further adjudicating National General Holdings Corp. and National General Insurance Company as having culpably aided and abetted such breaches.

(f)      An Order adjudicating and declaring that the Board has failed to respond in good faith to plaintiff's Initial and Supplemental Demands, and that plaintiff has standing to assert the claims alleged herein in this Complaint derivatively on behalf of Wells Fargo.

(g)      An Order adjudicating and declaring that all Defendants are barred and estopped from relying upon any actions taken or conclusions reached by the Board and Committee in connection with the acts and omissions alleged in this Complaint and the pre-suit Demands made upon the Board by plaintiff.

79

Amended Complaint

(h)      An Order assessing damages against the defendants to compensate Wells Fargo for the damages it has sustained and may hereafter sustain as a result of such defendants' breaches of duty, and conduct aiding and abetting such breaches, as detailed in this Complaint.

(i)      An Order directing that the defendants make restitution to Wells Fargo and to disgorge any and all compensation, profits or other benefits unjustly derived by them as a result of their breaches of duty, and conduct aiding and abetting such breaches, and their unjust enrichment alleged in this Complaint.

(j)      An Order assessing punitive damages against the Defendants on account of their conduct in connection with their breaches of fiduciary duties, and actions aiding and abetting such breaches.

(k)      An Order requiring that the Board cause Wells Fargo to adopt and implement therapeutic relief to remedy and prevent conduct such as described in this Complaint from happening again, including, without limitation: (1) causing Wells Fargo to engage, under the continuing supervision of the Court, an independent auditing firm which has not been involved with Wells Fargo to date to review and monitor such therapeutic relief; (2) engaging, under the continuing supervision of a Court-appointed monitor, an independent auditing firm and such other independent advisors who have not been involved with Wells Fargo to date and to authorize that such independent firms take such steps as they may deem necessary to review, revise, modify or correct any of Wells Fargo's internal controls relating to the wrongdoing alleged herein; and (3) commencing or authorizing the commencement of such lawsuits or arbitration proceedings, as may be appropriate to seek recovery for any losses or damages sustained by Wells Fargo against any and all culpable persons (other than the Individual Defendants) to recover damages sustained by Wells Fargo as a result of the acts and omissions alleged in this Complaint; and (4) establishing such committees of the Wells Fargo Board and management as may be appropriate to devise, implement and adopt such other measures, including but not limited to disclosure

Amended Complaint

practices strengthening of internal controls, and legal compliance oversight, as may prevent a recurrence of the conduct alleged in this Complaint.

(l)      Awarding to plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants and experts' fees, costs and expenses.

(m)      Granting such other and further relief as may be appropriate and available under applicable law, and as the Court may deem just and proper.

Dated: June 20, 2018                    GREENFIELD & GOODMAN LLC

                                        /s/ Ilene F. Brookler (CA Bar # 269422)

                                        Richard D. Greenfield
                                        Marguerite R. Goodman
                                        Ann M. Caldwell
                                        Ilene F. Brookler (CA Bar # 269422)
                                        250 Hudson Street-8th Floor
                                        New York, NY 10013
                                        917-495-4446
                                        whitehatrdg@earthlink.net
                                        Attorneys for Plaintiff

81

Amended Complaint